DECLARATION OF HARRY DAVIS  **12  CV  6134**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the following is true and correct:

1. I am a resident of Monroe County.

2. I am 60 years old and live in Rochester, New York.

3. I receive $785 a month in Social Security Disability Insurance and Supplemental Security Income benefits.

4. In March 2001, I contracted pneumococcal meningitis. I went to the emergency room at Strong Memorial Hospital on March 15th. I spent the next month in the intensive care unit at the hospital.

5. According to my doctors at the time, my condition was complicated by a combination of respiratory failure requiring prolonged ventilator support, disseminated intravascular coagulation, renal failure requiring dialysis, and a myocardial infarction. I also developed ischemia and necrosis of portions of my fingers and substantial portions of my feet. I was told by my doctors that I would have to have my feet and possibly by hands amputated to save my life. On May 8, 2001, I had a transmetatarsal amputation of both feet close to the heel, leaving me with little more than stumps.

6. On June 8, 2001, I was transferred to Monroe Community Hospital for the next nine months for rehabilitation, physical therapy, and to address complications resulting from the amputations.

7. I remained in the hospital until March 8, 2002.

1

8.  While I was in the hospital, I was found disabled and became eligible for SSD and SSI benefits. I received my first benefit payment by September 1, 2001.

9.  With the SSI benefits, I also became automatically eligible for the New York State Medicaid program.

10. Medicaid paid for the entire hospitalization, including the transmetatarsal amputations.

11. While I was in the hospital, I was in bed and confined to a wheelchair. My feet were wrapped in bandages and I was unable to walk.

12. When I was first released from the hospital, I used a wheelchair.

13. I had a prescription for my first pair of shoes when I was released from the hospital.

14. I was first directed to a shoe supplier that did not make molded shoes. The shoes provided by that first supplier did not enable me to walk.

15. Dr. Judith Baumhauer then recommended I go to Dr. John Jacobs at Feet First in Rochester, NY, for molded shoes.

16. Dr. Jacobs had shoes made to molds of my feet so that I would be able to walk.

17. I received my first pair of shoes from Dr. Jacobs in 2002, and he has made the shoes for me ever since.

18. Usually, I would go see Dr. Jacobs in October for him to cast a new mold of my feet. The shoes would arrive six to eight weeks later.

19. Dr. Jacobs handled the filing of the claim with Medicaid, and Medicaid always reimbursed him for coverage of the shoes. The Medicaid coverage of the shoes was never in doubt.

20. Typically the shoes wear out after about six months, but I would have to wait a full year before Medicaid would cover the replacements.

21. My shoes have been vitally important to my recovery and my ability to remain in my home. They allow me to walk. They allow me to move around in my apartment. They allow me to take care of myself in my home. They also allow me to take part in the community. They allow me to walk outside. They allow me to ride my bicycle, my primary mode of transportation.

22. Even with the shoes, however, I still need limited homecare services. An aide comes twice a week for a few hours to help with chores at home. Even standing to wash dishes is unbearably painful, and I need someone to help.

23. Medicaid pays for the aide services.

24. In 2010, when I saw Dr. Jacobs to get my shoes, he mentioned that the bones in my feet will start to protrude and my condition will become worse.

25. The pain had increased so much that I went to see Dr. Jacobs to order a replacement pair of shoes in September 2011.

26. Dr. Jacobs then told me that Medicaid would no longer pay for the shoes, and he would be unable to make them for me.

27. Until that moment, I was unaware of any change in the Medicaid policy regarding coverage of my shoes. I had received no prior notice of the new policy from Medicaid. I also had received no notice of what I should do to try to correct the State's decision not to cover my shoes.

28. I tried calling my primary care doctor to find out what I could do, but received no advice.

29. As a result of Medicaid's denial of coverage for my shoes, I have now worn through the interior foam padding completely, and the bones are beginning to wear through the hard rubber sole at the bottom from the inside. Standing for even brief periods of time is

3

excruciatingly painful. The pain caused by the shoes' deterioration has now become constant. My feet are in pain 24 hours a day, every day, even when I am not standing or walking.

30. As a result, the deterioration of my shoes and the State's failure to pay for a new pair have already limited my ability to walk.

31. If Medicaid is allowed to maintain its policy, I would become bedridden. I would no longer be able to walk, even in my own home. I would no longer be able to get from place to place. A wheelchair would not be a reasonable alternative. I would no longer be able to ride my bicycle; I ride my bicycle now to get everywhere, every day. I would no longer be able to climb the stairs to my apartment. I would no longer be able to go to the grocery store; I would no longer be able to visit friends, or engage in community activities.

Date: 2/7/12

Harry Davis

4

DECLARATION OF RITA-MARIE GEARY **12  CV  6134**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the following is true and correct:

1. I am 54 years old and live in Monroe County.

2. Until recently, I had received SSI and SSDI benefits, and was covered by Medicaid and Medicare.

3. As of January 1, 2012, I now receive SSDI $896 a month in SSDI benefits. Until December 31, 2011, I had been enrolled in full Medicaid. As of January 1, 2012, I am now enrolled in the Medicaid Buy-In Program for Working People with Disabilities (MBI-WPD).

4. I am disabled and suffer from numerous health conditions: Ankylosing Spondylitis, Psoriatic Arthritis, osteoarthritis, scoliosis, Raynaud's syndrome, osteoporosis, Fibromyalgia, Sjögren's syndrome, patellofemoral stress syndrome, plantar fasciitis, and Peripheral Neuropathy.

5. I need special open-toed prescription shoes because of my peripheral neuropathy and plantar fasciitis; my doctors do not know what causes the peripheral neuropathy.

6. Medicaid has covered my shoes since the late 1990s.

7. In the past, when I've needed the shoes, I've gone to Foot Performance Center in Rochester, New York. I gave them the prescription for the shoes. Then Foot Performance Center would provide me with the shoes.

8. The last time Medicaid covered shoes for me was in June 2010. Medicaid would not cover the open-toed shoes, but only closed-toed shoes. Those shoes caused so much pain that I could not wear them, and I had to replace them myself with open-toed shoes. I

could not afford to pay for the shoes myself. Sister Gracia of Sisters of Mercy found a charitable donor to cover the shoes for me.

9. On December 27, 2011, Dr. David E. High issued a new prescription for my shoes.

10. I attempted to fill the prescription as usual on January 3, 2012, at Foot Performance Center.

11. Foot Performance Center declined to fill the prescription, because Medicaid no longer covered the cost of the shoes.

12. The only way I can now obtain the shoes is by paying for them myself.

13. The shoes will cost about $130, and I cannot afford to pay for them.

14. Foot Performance Center provided me with a printout of the computer screen image indicating that coverage for the shoes was denied by Medicaid.

15. Medicaid provided me with no notice about the elimination of coverage of orthopedic footwear in general, and no notice of the decision to deny this request for coverage in particular. Medicaid also has provided me with no notice of the new limits on coverage of prescription footwear. Medicaid did not tell me that there are exceptions to these limitations, and they also did not tell me I have a right to request a hearing to challenge the denial of these services.

16. If the shoes are not replaced, the pain in my feet will increase. Without the shoes, I cannot walk properly and will fall. I have fallen many times in the past. My doctors have told me that I cannot afford any more falls. My numerous health conditions put me at risk of serious health consequences, if I fall. Because of my osteoporosis, I am at significant risk of breaking bones.

Date: 2/20/2012

Rita-Marie B. Geary

DECLARATION OF PATTY POOLE    **12    CV    6134**

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the following is true and correct:

1. I am a resident of Broome County.

2. I am 42 years old and live in Endicott, New York.

3. I suffer from the following ailments: lymphedema, diabetes, depression, obstructive sleep apnea, hypertension, morbid obesity, hyperthyroidism, and hyperlipidemia.

4. Because of my condition, I am disabled and unable to work. I receive SSI benefits of $785 per month. I am also eligible for Medicaid based on my disability and receipt of SSI benefits.

5. My lymphedema has caused severe swelling in my feet, ankles, and legs. My doctors said that I would need compression stockings to control the swelling and prevent infections from occurring.

6. Early in 2011, I developed an infection in my right leg that rapidly grew to a mass about a foot in diameter.

7. On March 24, 2011, I was admitted to the hospital for intravenous antibiotic treatment to eliminate the infection prior to the surgical removal of the mass.

8. On April 4, 2011, Dr. Samuel Pejo removed the large mass on the back of my right knee.

9. I was discharged from the hospital on April 18, 2011.

10. After the surgery, Dr. Pejo prescribed compression stockings to control the swelling in my legs.

1

11. Following a prior authorization request, I received a letter from the New York State Department of Health dated June 20, 2011, denying coverage of compression stockings, citing the new law eliminating coverage of compression stockings. The letter made no mention of any exceptions, nor did it advise me of any right to challenge the State's denial.

12. Since my surgery, I have had to rely on alternatives to compression stockings to control the swelling in my legs as much as possible. I use two binders on my upper legs and wrap her lower legs from toe to knee in bandages. The process of doing the massage (also referred to as "lymphedema touch") that goes from my armpits to my feet and applying the bandages takes about two hours every time they need to be reapplied. The binders fall off whenever I try to walk. The binders no longer stay in place even when I am lying down.

13. Lack of compression stockings has allowed the swelling in my legs to continue.

14. The continued swelling and inadequate alternative treatments prevent me from engaging in virtually any activity. This has exacerbated related health issues such as my on-going depression, and has made it difficult for me to lose the weight I need to lose.

15. Because of my size, my doctors have said I need custom-made compression stockings. These cost roughly $900.

16. On my limited income, I cannot afford to pay for the stockings myself.

17. Most recently, I have also been unable to obtain even the inadequate alternatives to compression stockings.

2

18. As of the beginning of January, 2012, the suppliers have told me that they can no longer provide me with the bandages I have used to control my lymphedema, because the Medicaid rate does not cover their cost.

19. I will have to pay $192.17 a month to purchase the bandages myself.

20. I cannot afford to make these payments.

21. The lack of compression stockings has caused me physical and emotional hardship. My lymphedema has progressed for lack of adequate treatment and my depression has worsened. Lack of compression stockings has also prevented her from engaging in the community; the inadequate alternate treatments have rendered me virtually home-bound.

Date: 2/11/12

Patty Poole

3

DECLARATION OF ROBERTA (BOBBI) WALLACH

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the following is true and correct:

1.  I am 51 years old and live in Monroe County, New York.

2.  I have secondary progressive multiple sclerosis. I was first diagnosed with the disease over 30 years ago. Since that time, the disease has gradually progressed, limiting my ability to function. Both of my legs are now paralyzed, and my left arm is also paralyzed. Basically, all I have now is the use of my right arm and my mouth.

3.  I also have edema, which causes swelling in my legs due to the accumulation of excess fluids.

4.  Because of these conditions, I am prone to develop blood clots. Should blood clots develop, they could travel to my heart or my lungs and kill me.

5.  I need compression stockings to control the swelling and to prevent these blood clots from forming in first place.

6.  I am disabled and unable to work, though I am still employed a small amount at Xerox. I receive SSDI benefits of $1545 a month and $68 a month from Xerox. Every month, I place a portion of my income in a Supplemental Needs Trust, which helps me cover some of the many expenses associated with my disability.

7.  In 2007, my condition had deteriorated to such an extent that I had to move into a nursing home. I did not want to stay in the nursing home forever.

8.  I became eligible for Medicaid when I moved into the nursing home.

9.  Medicaid has paid for my compression stockings ever since I went into the nursing home.

10. I remained in the nursing home until April 1, 2011, when I was able to move into my own apartment.

11. My compression stockings were last covered by Medicaid in early in 2011. I tried to make them last as long as possible, but by the end of the year, they really needed to be replaced.

12. Dr. Dowlatshahi, my primary care doctor, gave me a new prescription for the compression stockings in December 2011.

13. When I went to order the compression stockings, I was told that Medicaid would no longer cover them, and I would have to pay for them myself.

14. No one had told me about the change in coverage. No one told me that there were any exceptions to the new policy. And no one told me I could request a fair hearing to contest the denials.

15. Because the risks of not having the compression stockings are so incredibly great, I paid for them myself. One pair of compression stockings for me cost $13.50.

Date: 2-21-2012

Roberta Wallach

DECLARATION OF CARLOS M. SWANGER, M.D. 12   UV   6134

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1. I am a physician and practice internal medicine at Clinton Crossings Internal Medicine in Rochester, New York, part of the University of Rochester Medical Center. I am Assistant Professor of Clinical Medicine at the University of Rochester School of Medicine and Dentistry. I graduated from the University of Rochester School of Medicine and Dentistry in 1990. I completed my residency at Strong Memorial Hospital in Rochester, New York, in 1993, and a fellowship at Strong Memorial Hospital in 1994. I have been practicing medicine in Rochester for 22 years.

2. I am board certified in internal medicine, and am licensed to practice in the state of New York.

3. I began treating Harry Davis after he was discharged from Monroe Community Hospital, where he had been recovering from an episode of embolic septic emboli which resulted in bilateral transmetatarsal amputations of both of his feet.

4. As a result of the amputations, Mr. Davis has required special shoes and ongoing care with orthopedics for his feet.

5. The special shoes enable Mr. Davis to walk and provide additional protection to the stumps that remain of his feet.

6. Even with the shoes, Mr. Davis has suffered significant callus formation and skin breakdown which has required intervention by orthopedics.

1

7. Mr. Davis had been able to obtain the shoes and orthotics ever since he first needed them in 2002. The shoes have worked well for him and have allowed him to walk and maintain the health of his foot-stumps.

8. As of April 1, 2011, however, Medicaid has refused to cover medically necessary shoes for patients like Mr. Davis.

9. Mr. Davis has worn the same pair of shoes for over a year now, and they need to be replaced.

10. I have issued a new prescription for his shoes, but Mr. Davis has been unable to have that prescription filled, because Medicaid will no longer cover the shoes for him.

11. If Mr. Davis is forced to wear regular shoes, the pressure-related consequences to the stumps of his feet could be dire.

12. It will impact his ability to ambulate safely and may result in the need for further, more costly interventions.

13. He will likely require a wheelchair and additional aide services. He will risk further infection and further loss of limb. He will also face possible institutionalization.

14. Such harms would be catastrophic for him. Therefore, it is imperative from a medical standpoint and certainly from a psychosocial standpoint that Medicaid cover these prescription shoes for Mr. Davis.

Date:  2-28-2012

Carlos M. Swanger, M.D.

2

**12 CV 6134**

DECLARATION OF DAVID E. HIGH, D.P.M.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1. I am a podiatrist at Metro Footcare in Rochester, New York. I received my undergraduate training from the University of Pittsburgh and graduate degree from Pennsylvania College of Podiatric Medicine, now part of Temple University. I did my surgical residency in Buffalo, New York, and have been practicing medicine in Rochester since 1997. I volunteered at the Highland Podiatry Clinic that provided foot care for those who were not be eligible to be seen in a private office. This clinic is now closed. I am a member of the American Podiatry Medical Association, American College of Foot and Ankle Surgeons, and the New York State Podiatric Medical Association, where I served as president from 2007-2009. I am licensed to practice in the state of New York.

2. I have been treating Rita-Marie Geary for a number of years.

3. Ms. Geary suffers from peripheral neuropathy as well as a host of other ailments, including ankylosing spondylitis, psoriatic arthritis, osteoarthritis, scoliosis, osteoporosis, patellofemoral stress syndrome, and plantar fasciitis. While peripheral neuropathy is most commonly associated with diabetes and cancer, Ms. Geary's peripheral neuropathy has no such clear cause.

4. Peripheral neuropathy creates a number of risks, making orthopedic footwear necessary. Peripheral neuropathy impairs the proper functioning of sensory and motor nerves, and most commonly causes numbness in the feet and hands. Ms. Geary's peripheral neuropath primarily affects her balance.

1

5. Ms. Geary needs special shoes and orthotics because of her peripheral neuropathy. The combination of impairments she suffers increases the risk of harm should she not be able to obtain the shoes. Her various forms of arthritis place her at increased risk of falling, and the loss in bone density caused by her osteoporosis places her at risk of broken bones and other traumatic injuries from even the smallest of falls.

6. It is, therefore, essential that Ms. Geary have properly fitting orthopedic footwear, or she faces significant health risks.

Date: 3/13/12

David E. High, D.P.M.

2

MAR-01-2012 THU 03:11 PM                    FAX NO.                              P. 03
02-28-'12 18:08 FROM- Empire Justice Ct       585-464-4019          T-407  P0003/0005 F-828

# 12 CV 6134

## DECLARATION OF SAMUEL PEJO, M.D., F.A.C.S.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1. I am a plastic surgeon and practice medicine at UHS Plastic Surgery in Binghamton, New York. I received my medical degree from the Far Eastern University, Nicanor Reyes Medical Foundation, Quezon City, Philippines, and graduated in 1965. I completed my residency at Rochester General Hospital in Rochester, New York, in 1971, and was a Slaon Kettering Fellow at Northwestern University in Chicago, Illinois, from 1971 to 1973.

2. I am board certified by the American Board of Plastic Surgery. I am licensed to practice in the state of New York.

3. In my current practice at the UHS Medical Group, I specialize in plastic surgery, cosmetic surgery, facial plastic surgery, and hand surgery.

4. Patty Poole was referred to me by her primary care physician in March 2011 to treat a large tumor-like mass on the back of her right leg that had grown rapidly to a size of about 12 inches in diameter.

5. Patty Poole suffers from lymphedema. Because of the excessive swelling of her lower extremities from the lymphedema, she is prone to cellulitic infection, among other complications.

6. An MRI performed on 2/23/2011 identified the mass as cellulitis.

7. The mass would have to be surgically removed, but, in order for the surgery to take place, the infection would first have to be controlled with antibiotics.

1

MAR-01-2012 THU 03:12 PM    FAX NO.    P. 04

02-28-'12 18:08 FROM- Empire Justice Ct    585-454-4019    T-407  P0004/0005 F-828

8.  Ms. Poole had to be hospitalized and treated with a two-week course of IV antibiotics before an operation could take place.

9.  She was admitted to the hospital on March 24, 2011.

10. On April 4, 2011, I removed a large mass from the back of Ms. Poole's leg.

11. She remained in recovery in the hospital until her discharge on April 18, 2011.

12. The surgery itself can only offer temporary relief of an acute problem, in this instance, the removal of the large mass on her leg. Ms. Poole's future health and well-being will now depend on preventing such problems from recurring.

13. Because of her morbid obesity and the severe swelling of both her lower extremities, the risk of infection will persist unless the swelling caused by her lymphedema is controlled.

14. The current standard of care, as established by a consensus statement generated by the International society of Lymphology, for maintaining reduced limb volume involves wearing a compression garment during the day.

15. Therefore, Ms. Poole will require a lower-extremity compression garment. For optimal results, the garment may require custom fitting.

16. I prescribed a compression stocking for her after she was discharged from the hospital.

17. She has yet to receive the compression stockings necessary to treat her condition properly and prevent recurrent infections of cellulitis, the recurrence of tumor-like masses, and ulceration of the skin.

18. Without the compression stockings she has had to work with her other doctors to develop alternative methods of controlling the swelling.

2

MAR-01-2012 THU 03:12 PM                    FAX NO.                        P. 05
02-28-'12 18:08 FROM-  Empire Justice Ct          585-454-4019        T-407  P0005/0005 F-828

19. These treatments have failed to control the swelling effectively. When I last saw Ms. Poole, the swelling in her lower extremities had reached proportions comparable to her pre-operative state.

20. Without proper treatment, she will continue to suffer increased swelling, skin breakdown, secondary infections, and ulcers. These conditions are better prevented than treated.

21. Failure to treat her lymphedema with compression stockings will result in what can only be characterized as a medical disaster—recurrent infection, massive edema forming tumor-like masses, and ulceration of the skin. Without adequate control of the swelling in her extremities with properly fitted compression stockings, Ms. Poole will likely develop further infections, much like the one that sent her to the hospital last April.

22. The costs associated with providing the compression stockings necessary to control the swelling will be dwarfed by the astronomical costs of subsequent hospitalizations. The one surgery she has already had is indicative of the extreme level of care she will likely require to treat subsequent infections: two-week, in-patient IV antibiotic treatment; surgery to remove the swollen and infected mass; followed by nearly two weeks of recovery.

23. It is imperative that Medicaid cover the compression stockings for Ms. Poole in order to prevent the recurrence of infection or other equally disastrous medical complications.

Date: _March 1- 2012_

_Samuel P. Pejo MD, FACS_

Samuel Pejo, M.D.

3

FROM : Panasonic ANS/FAX                PHONE NO. :                    Jan. 01 1994 06:43AM P2
03-06-'12 16:08 FROM- Empire Justice Ct        585-454-4019

**12' CV 6134**

### DECLARATION OF BAHRAM DOWLATSHAHI, M.D.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1.  I am a physician and practice medicine in Rochester, New York. I graduated from the Tehran University of Medical Sciences, Faculty of Medicine, in Iran in 1960. I completed a residency at St. Joseph Mercy Oakland in Pontiac, Michigan, and an internship at Westmoreland Hospital in Greensburg, Pennsylvania. I have been practicing medicine for 52 years. I have a Fellowship in Cardiology from St. Joseph Hospital and Ann Arbor University of Michigan.

2.  I specialize in internal medicine and cardiology.

3.  I am board eligible and licensed to practice in the state of New York.

4.  Roberta Wallach has been a patient of mine for many years.

5.  Ms. Wallach has multiple sclerosis and has suffered from the disease for over thirty years.

6.  Her health has continually deteriorated throughout the duration of her illness. She currently has paraplegia of the legs and monoplegia of the left arm.

7.  Because of her paralysis, the blood is unable to circulate properly in her legs.. As a result, Ms. Wallach suffers edema in the lower extremities.

8.  Because of the excess swelling of her legs caused by the edema, Ms. Wallach is prone to develop deep venous thrombophlebitis (DVT), blood clots forming in the legs. The blood clots can break off and obstruct the arteries of the lungs. This condition is called pulmonary embolism, and can be fatal.

FROM : Panasonic ANS/FAX          PHONE NO. :                    Jan. 01 1994 06:43AM P3

03-05-'12 16:08 FROM- Empire Justice Ct        585-454-4019          T-426  P0003/0003 F-864

9. The American Heart Association, together with the Council on Thrombosis, in consultation with the Council on Cardiovascular Radiology, recommend graduated compression stockings as an effective preventative treatment for patients prone to DVT.

10. Because of the severity of her condition, it is imperative that Ms. Wallach control the swelling in her legs. Compression stockings offer the most effective treatment and help prevent clots from forming and developing into potentially fatal pulmonary embolism.

11. Because Medicaid no longer covers compression stockings for patients like Ms. Wallach, she must pay for them herself.

12. Left uncontrolled, the edema in her lower extremities would also increase the risk of infection and ulceration of the skin. Any of these complications would have life-altering consequences for a person in Ms. Wallach's condition. Should they develop, they could lead to unnecessary hospitalizations and eventual institutionalization.

13. It is imperative that Medicaid cover her compression stockings to prevent serious health risks and potentially fatal consequences of pulmonary embolism in Ms. Wallach.

Date: 3/5/12

Barham Dowlatshahi, M.D.

2

**DECLARATION OF JERRY SVOBODA, M.D.,** 12 CV 6134

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the following is true and correct:

1. I am physician and specialize in vascular surgery. I earned my medical degree from the MCP Hahnemann University School of Medicine (now the Drexel University College of Medicine) in Philadelphia, Pennsylvania. I did my residency in general surgery at Robert Packer Hospital/Guthrie Clinic in Sayre, Pennsylvania, and completed a fellowship in vascular surgery at Englewood Hospital and Medical Center in Englewood, New Jersey. I currently practice at Unity Vascular Surgery, part of the Unity Health System, in Rochester, New York. I have been in practice for the past 28 years.

2. I am board certified by the American Board of Surgery in both General and Vascular Surgery. I am licensed to practice in the state of New York.

3. I am a hospital-employed vascular surgeon in a group of three vascular surgeons within the Unity Health System. My practice consists of the care of both in-patients and out-patients with a variety of vascular conditions such as aneurysms, carotid artery disease, peripheral artery disease, venous disease, and others.

4. I was alarmed when I first learned of the state's change in policy regarding the coverage of compression stockings. The state's policy to cover compression stockings only for pregnant women and for cases involving venous stasis ulcers makes no sense and will miss the vast majority of patients who will require compression stockings.

5. While it is clearly appropriate to cover compression stockings to aid circulation in the legs during pregnancy, it makes no clinical sense to cover compression stockings otherwise only in cases of venous stasis ulcers. Compression stockings are best used to *prevent* such ulcers from developing in the first place. In terms of this exception, the state's policy risks encouraging patients to allow dangerous medical conditions to develop in order to receive necessary care rather than making use of effective preventive treatments to avoid such conditions in the first place.

6. Compression stockings increase blood circulation in the lower extremities by providing graduated pressure on the lower leg and foot and, in some cases, the thigh, to alleviate circulatory problems associated with edema, phlebitis, and thrombosis. Their use allows more blood to return to the heart and less blood to pool in the feet, ankles, and lower legs.

7. People need compression stockings for a variety of reasons. The vast majority of those requiring compression stockings need them to treat chronic venous insufficiency (CVI). CVI refers to the inability of the veins in the legs to pump blood back up the legs to the heart. Blood is not pumped up the legs to the heart by the veins themselves. Rather, the contraction of muscles in the feet and calves pushes blood upwards toward the heart. To keep gravity from forcing the blood back to the feet and ankles, one-way valves within the veins allow the blood to flow up while preventing it from being pulled back down. CVI occurs when these valves are damaged and cease functioning properly. CVI causes chronic swelling of the legs that can often weep directly through the skin. Left untreated, such excess swelling can cause life-threatening infection.

8. CVI often occurs as the result of a blood clot in the leg, a condition known as deep vein thrombosis, but it can also occur for a number of other reasons. Whatever the cause, it must be treated. The longer CVI persists untreated, the more dangerous the harms that can result. Delaying treatment will only increase its severity.

9. If CVI is not treated, the pressure and the swelling will increase, causing the capillaries in the legs to burst. When this happens, the skin covering the leg becomes vulnerable to harm, and is likely to break when bumped or scratched. Burst capillaries result in a number of conditions ranging from local tissue inflammation to open venous stasis ulcers. These ulcers are difficult to treat and often become infected. If the infection is not treated, it can spread to other tissues in a condition called cellulitis.

10. Treating these infections is far more complicated than controlling the underlying CVI. The infections resulting from uncontrolled swelling in the lower extremities often require hospitalization and treatment through I.V. antibiotics. Such infections are always hazardous for the patient. The problem with the state's new policy is that it delays use of compression stockings, which are known to *prevent* dangerous

health conditions from developing, until serious medical complications have already developed, as with venous stasis ulcers. To prohibit clinically effective preventive measures until significant health hazards have occurred is irresponsible medical practice, especially where, as here, *the cost of delaying treatment far outweighs the costs of preventative treatment.*

11. Compression stockings are an effective, inexpensive remedy for excess swelling caused by CVI. They increase blood flow back to the heart, thereby reducing the risk of open sores and infection that would otherwise ensue. Compression stockings must only be worn during the day, and are not necessary when the patient is in bed at night. A typical patient will require two pair of compression stockings a year. At a typical cost of about $70 or $80 a pair, they offer a cost-effective way to prevent far more complicated and expensive treatments and hospitalizations. When a patient is hospitalized for treatment, *costs quickly escalate into the thousands and tens of thousands of dollars.* Inexpensive compression stockings can avoid such unnecessary expenditures.

12. A number of other conditions must also be treated with compression stockings, including, for example, lymphedema and congenital blood vessel malformation. Paralysis in the lower extremities also creates a need for compression stockings; the muscles in the paralyzed legs are incapable of working to pump the blood back up towards the heart.

13. Furthermore, compression stockings are not medically necessary for all conditions that might benefit from their use. Varicose veins are a prime example. In the vast majority of cases, compression stockings are indicated but not required for someone with varicose veins. The veins may be unsightly and regular use of compression stockings during the day can help slow the spread of varicose veins, but varicose veins themselves are not hazardous; nor are they prone to develop the potentially life-threatening infections that can occur as a result of untreated CVI.

14. In my practice, I also perform a number of transmetatarsal amputations. Not all such amputations are alike, and most do not create a need for special footwear. The more of the foot that remains, the less need there is for special remedies subsequent to the operation. Most patients with transmetatarsal amputations can continue wearing their regular shoes. However, if most of the foot is removed in such a procedure, special shoes will often be required to protect what remains of the foot and permit safe ambulation. Prosthetics are almost never possible as a remedy in such situations. But molded footwear can and does provide an effective remedy in such situations.

15. Various other conditions also create a need for orthopedic footwear. Patients with peripheral neuropathy require special shoes to protect their feet. The vast majority of patients with peripheral neuropathy are diabetics. The state's policy to cover prescription footwear as part of a comprehensive treatment for diabetes is sensible to the extent that it will continue to provide medically necessary footwear for the majority of people who require it. However, it will miss those who have peripheral neuropathy as the result of any other condition. There are certainly non-diabetic conditions that require an exception for the on-going use of special shoes.

16. Neuropathic ulcers on the bottoms of the feet also create a need for prescription shoes. These patients, too, should be exempted from the state's policy, so that they will be able to obtain medically necessary footwear.

Date: March 6, 2012

Jerry J. Svoboda, M.D.

12 CV 6134

**NEW YORK**
*state department of*
**HEALTH**

Nirav R. Shah, M.D., M.P.H.
Commissioner

Sue Kelly
Executive Deputy Commissioner

RECEIVED

JUN 23 2011

PROFESSIONAL HOME CARE

June 20th 2011

Patty Poole
700 Woodrow Avenue
Endicott, NY 13760

RE: Custom compression stockings
PA#: 01046581015

Dear Ms. Poole:

This letter is to inform you that the prior approval request submitted for (Custom compression stockings_code A6549), submitted by (Professional Home Care Inc) is being returned to your equipment provider because effective April 1, 2011, the law concerning this item has changed and it is no longer paid for under the New York State Medicaid program.

Please contact your provider if you have any questions about your request for this item. If you have questions about this letter, please contact me at 1-800-342-3005, option 1. When calling, please reference the PA# listed above.

Sincerely,

Kevin Hepp, PT
Health Systems Specialist II
Medical Prior Approval Unit
Office of Health Insurance Programs
Division of Provider Relations and
Utilization Management

CC:
Beneficiary File
Dr. Marita Florini
Professional Home Care Inc

HEALTH.NY.GOV
facebook.com/NYSDOH
twitter.com/HealthNYGov

12 CV 6134

### Jerry Joseph Svoboda
### Curriculum Vitae--March, 2012

**Personal data:**

Jerry Joseph Svoboda
70 Brandywine Lane
Rochester, New York 14618
(585) 442-8386
elixir17@aol.com   jerry.svoboda@us.army.mil   jsvoboda@unityhealth.org

office: Unity Vascular Surgery
2655 Ridgeway Avenue, Suite 240
Rochester, New York 14626
phone: (585) 723-7060   pager: (585) 238-0193
fax: (585) 723-7325

born: Cleveland, Ohio, August 23, 1951
marital status: married 34 years (wife, Adelaide, Ph.D. in cell biology)
children: Elizabeth Ann Werness (age 30, resides in San Jose, CA)
          Mark Henri Svoboda (age 27, resides in Richmond, VA)

**Education:**

Saint Louis University
Saint Louis, Missouri
A.B., biology, 1973

Hahnemann Medical College (presently Drexel University College of Medicine)
Philadelphia, Pennsylvania
M.D., 1977

**Research Activities:**

Produced time-lapse motion picture of frog embryo development,
Saint Louis University, 1970.

Regeneration studies of invertebrate sea anemone,
Saint Louis University, 1972.

Laboratory and clinical studies on human arterial resistance measurement
during leg bypass surgery, Englewood Hospital, 1982-83.

Chief clinical investigator at Park Ridge Hospital for Phase II FDA clinical
trials of Xintec arterial laser device, 1989-90.

**Post-graduate training:**

    Internship:  Mercy Medical Center
                  Denver, Colorado, 1977-78
                  rotating - family practice  (12 mos. incl. 6 mos. surgery rotations)
                  Dr. Carl Flaxer, director

    Residency:  Guthrie Clinic/Robert Packer Hospital
                  Sayre, Pennsylvania, 1978-1982
                  general surgery (incl. chief resident)
                  Dr. John Thomas, director

                  Children's Hospital of Pittsburgh
                  Pittsburgh, Pennsylvania, 1980
                  3 month rotation in pediatric surgery
                  Dr. Wiliam Kiesewetter, director

    Fellowship: Englewood Hospital
                  Englewood, New Jersey, 1982-83
                  vascular surgery
                  Dr. Herbert Dardik, director

**Licensure:**

    Diplomate, National Board of Medical Examiners, 1978

    New York licensed physician #158142 (issued 5/7/84)
        (previously held licenses in PA, NJ, & CO)

    FCC licensed amateur radio operator, KB2QIU, Extra Class

**Specialty certification:**

    Certified, American Board of Surgery (#29422), 2/29/84.  Recertified in Surgery
        10/23/92, 10/18/02, and 12/10/11.  Present certificate valid until 7/1/2024.

    Certified, American Board of Surgery, Special Qualifications in General Vascular
        Surgery (#863), 5/21/91.  Recertified in Vascular Surgery 10/98 and 10/08 .
        Present certificate valid until 7/1/2021.

**Professional Affiliations:**

    Member, American Medical Association
            New York State Medical Society
            Monroe County Medical Society
            Rochester Surgical Society
            Rochester Vascular Society
            United States Army Medical Corps

Elected member, Upstate New York Vascular Society
Society for Clinical Vascular Surgery
Eastern Vascular Society
Fellow, American College of Surgeons (elected 1988)
(Upstate NY Young Surgeon ACS representative, 1995)
(member ACS local applicants review committee 1997-present)

Full-time practice general & vascular surgery, Denver, CO, 1983-84.
Full-time practice general & vascular surgery, Rochester, NY, 1984-90.
Full-time practice vascular surgery, Rochester, NY, 1990-June 30, 2006
(employee Rochester Vascular Surgery Associates 1984-October, 2008)
Part-time practice vascular surgery, Rochester, NY, July, 2006-present (.75 FTE).

**Teaching experience:**
Biology laboratory instructor, Saint Louis University, 1972-73.

Teaching surgery to medical students and residents during residency and
fellowship, 1977-1983, subsequently in practice.

Ancillary surgical teaching staff, Mercy Medical Center, Denver, 1983-84.

Clinical Assistant Professor of Surgery, University of Rochester, 1984-2002.
(inactived when surgical residents no longer rotated to Unity's hospitals)

Community internship program, Monroe Cty.Medical Society, 1996 to present.

**Hospital appointments:**
Unity Hospital (formerly Park Ridge Hospital), Rochester, New York
Attending surgeon, general & vascular surgery
(general surgery 1984-90, vascular surgery 1984-present)

Lakeside Memorial Hospital, Brockport, New York
Attending surgeon, vascular surgery  (1984-present)

Highland Hospital, Rochester, New York
Attending surgeon, vascular surgery
(1999-2011)

United Memorial Medical Center, Batavia, New York
Attending surgeon, vascular surgery
(2004-05 and 2008-2010)

Saint Mary's Hospital, Rochester, New York
Attending surgeon, general & vascular surgery
(1984-until acute care hospital status ceased in 1997)

**Medical Staff Positions:**

St. Mary's Hospital representative to Monroe County Medical Society, 1989-91.

Member, St. Mary's Hospital Medical Board and Medical Executive Board, 1989-91 and 1995-97.

Member, Park Ridge Hospital, Medical Executive Committee, 1991.

Monroe Cty. Medical Society Board of Directors, 1989-91, 2001-03, & 2006-11.

Monroe County Medical Society Editorial Board, 1990-present.

Monroe County Medical Society Executive Board, 1990-91 & 2006-11
(asst. treasurer, treasurer, secretary, president-elect, president, past-president)

President, Monroe County Medical Society, May, 2010-May, 2011.

President, Saint Mary's Hospital Medical & Dental Staff, 1996.

Assistant Chief of Surgery, Park Ridge Hospital, 1990-91 and 1995-97.

Assistant Chief of Surgery, Lakeside Hospital, 2002-2010.

Division Chief, Vascular Surgery, Park Ridge Hospital, 1995-97.

Division Chief, Vascular Surgery, Lakeside Hospital, 2001-2003.

Employed by Unity Health System (Unity Vascular Surgery)
.75 FTE vascular surgeon 10/2008-present.

**Committee and Review Activities:**

Pharmacy Committee, St. Mary's Hospital/Unity Hospital, 1987-present.

Chairman, Drug Usage Committee, St. Mary's Hospital, 1992-1996, then Unity Hospital, 1997-2006 and 2009-10.

Tissue & Transfusion Committee, Park Ridge Hospital, 1988-89.

Blood Usage Committee, St. Mary's Hospital, 1990-91.

CPR Committee, St. Mary's Hospital, 1990.

Surgical laser committee, Park Ridge Hospital, 1988-89.

Surgical Case Reviewer, Park Ridge Hospital, 1986-1991;

Surgical Case Reviewer, Lakeside Memorial Hospital, 1995-present.

Utilization Review Committee, Lakeside Memorial Hospital, 2004-present.
Chairman, August, 2010-present.

Reviewer, Network Design Group and Island Peer Review Organization (for NYS
Health Dept.) for surgical cases re. quality of care and utilization, 1988-91.

Member, pretrial malpractice panels for consideration of surgical cases,
Monroe County Court, 1985-1990.

Coordinator of Continuing Medical Education, COB Speicher (Iraq) Hospital,
U.S. Army, August-November, 2007.

Member, Credentials Committee, Unity Health System, 2011-present.

Delegate from Monroe County to MSSNY House of Delegates, 2008 and 2011.

Member, Asbury First Methodist Church Wellness Clinic Committee, 2011-12.

## Honors and Awards:

College:  -4 year academic scholarship, St. Louis Univeristy
          -graduated magna cum laude, St. Louis University
          -Beta Beta Beta, national biological honor society, 1973

Medical School:
          -letter of commendation in psychiatry
          -certificate of distinction in surgery

Post-graduate:
          -T. Leon Howard Award (resident of the year), Mercy Medical
              Center, Denver, 1978.
          -Surgical Resident of the Year, Guthrie Clinic, 1980 & 1982.
          -First prize, resident papers competition, Central PA chapter,
              American College of Surgeons, 1978.
          -Guthrie Clinic resident papers competition:
              First & second prizes, 1979.
              First prize, 1981 & 1982.
          -Golden Pen Award, Rochester Democrat & Chronicle, 1992.
          -Unity Health System Physician Recognition Award, 2002.
          -Unith Health System 25 year Service Award, 2009.
          -Mercy Outreach Center Angel of Mercy Award, May, 2009.
          -U.S. News & World Report listed as a Top Vascular Surgeon, 2011-12.
          -named as a Unity Guardian Angel caregiver, Feb., 2012.

Military:

-Army Commendation Medal, 2007 and 2010

-Global War on Terrorism Service Medal

-Iraq Campaign Medal with campaign star

-Afghanistan Campaign Medal with campaign star

-National Defense Service Medal

-Armed Forces Reserve Medal, 2007 and 2010

-NATO Medal

-Army Service Ribbon

**Publications:**

Svoboda, J. and Sewell, W.  Injuries to the thoracic aorta from blunt trauma. Guthrie Bull, 1979, 48, 257-269.

Kohman, L. and Svoboda, J.  Splenic abscess following appendicitis.  Contemp Surg, 1981, 18, 48-53.

Svoboda, J. and Cohen, R.  Brodie's abscess of the ilium.  Guthrie Bull, 1981, 51, 115-119.

Kahn, M., Ibrahim, I., Sussman, B., Mendes, D., Svoboda, J., and Dardik, H.  Dialysis access: an exercise in strategy. Contemp Surg, 1983, 23, 95-101.

Dardik, H. Sussman, B., Ibrahim, I., Kahn, M., Svoboda, J., Mendes, D., and Dardik, I. Distal arteriovenous fistula as an adjunct to maintaining arterial and graft patency for limb salvage. Surgery, 1983, 94, 478-486.

Dardik, H., Sussman, B., Kahn, M., Greweldinger, J., Adler, J., Mendes, D., Svoboda, J., and Ibrahim, I. Lysis of arterial clot by intravenous or intraarterial administration of streptokinase. Surgery, Gynecology, & Obstetrics, 1984, 158, 137-140.

Svoboda, J., and Thomas, J.  Splenic artery-pancreatic duct fistula.  A rare cause of gastrointestinal bleeding.  Guthrie Bull, 1984, 53, 157-162.

Svoboda, J., and Balaji, M.  Management of TIAs (letter).  JAMA, 1985, 253, 2192-93.

Stephenson, T., McCabe, J., Svoboda, J., Balaji, M., Feinstein, M., Mehta, R. Renal arteriovenous fistula in the setting of subacute bacterial endocarditis. NY State J Med, 1989, 89, 530-32.

Svoboda, Jerry J. Letter to Ann Landers re Crisis in Nursing  (published in her national newspaper column). Nov. 17, 1989.

Svoboda, Jerry J. Letter to Editor re newspaper publicity for a local divorce. Democrat & Chronicle (Gannett), 1990.

Svoboda, J., and Balaji, M.  Open supramalleolar amputation of the infected foot: an underutilized, two-stage procedure. NY State J Med, 1990, 90, 77-78.

Svoboda, Jerry J.  Why tolerate tobacco? (letter) Democrat & Chronicle (Gannett), Feb. 15, 1990.

Svoboda, J. J., and Balaji, M. R.  Basilic vein transposition: the ideal secondary fistula. In: Sommer, B. G., Henry, M. L., eds. Vascular Access for Hemodialysis II. Precept Press, Inc.; 1991.

Bleba, J., Ouriel K., Green, R.M., Fiore, W.M., Welch, E.L., Svoboda, J.J., Balaji, M.R. Laser angioplasty in peripheral vascular disease: Symptomatic versus hemodynamic results. J Vasc Surg, 1991, 13, 222-230.

Svoboda, J., Verstraete, A., and Balaji, M. The Surgeon at Work: A technique to simplify insertion of the Bird's Nest Cava Filter from the left femoral vein. SG&O, 1992, 174, 522-524.

Svoboda, Jerry J. Letter to Editor re HIV testing. Democrat & Chronicle (Gannett), July, 1992.

Svoboda, Jerry J. Letter to Editor re smoking cessation. Democrat & Chronicle (Gannett), December 3, 1992.

Svoboda, Jerry J. Letter to Editor re ecological consequences of salt mine pumping into Genesee River. Democrat & Chronicle (Gannett), April 6, 1994.

Svoboda, Jerry J. Letter to Editor re handgun availability. Democrat & Chronicle (Gannett), Aug. 12, 1994.

Svoboda, Jerry. Kicking the Habit . . . Still Sound Advice. Unit Dose (St. Mary's Hospital), April, 1995.

Svoboda, Jerry J. Letter to Editor (re a local surgeon who accepts high risk patients) Democrat & Chronicle (Gannett), Nov. 21, 1996.

Svoboda, Jerry J. Laparoscopic Splenectomy (letter). Contemp Surg, 1996, 48, 16.

Svoboda, Jerry J. Fisher misplaces priorities on China (letter). Democrat & Chronicle (Gannett), Nov.13, 1997.

Svoboda, Jerry J. It's time to come to terms with guns (letter). Democrat & Chronicle (Gannett), April 29, 1999.

Svoboda, Jerry J. Stroke therapy risks considerable (letter). Democrat & Chronicle (Gannett), July 29, 1999.

Svoboda, Jerry J. Hospitals underpaid; health care suffers (letter). Democrat & Chronicle (Gannett), August 12, 2001.

Svoboda, Jerry J. Thrombolysis for Acute Stroke (letter). JAMA, 2005, 293, 421-422.

Svoboda, Jerry. Drug for stroke requires caution (letter). Democrat & Chronicle (Gannett), February 13, 2005.

Svoboda, Jerry J. Getting your patients to quit smoking. Endovascular Today, March, 2005, 3, 23-28.

Svoboda, Jerry J. Pluto Bites the Dust (letter). Discover, January, 2007, pg. 6.

Svoboda, Jerry Medical Volunteerism: A Personal Reflection. The Bulletin (Monroe County Medical Society), November, 2009, 75, pgs. 19-21.

Svoboda, Jerry. Taliban killings of Afghans comon (letter). Democrat & Chronicle (Gannett), August 13, 2010.

Svoboda, Jerry J. Join the Medical Society? Why would I want to do that? The Bulletin (Monroe County Medical Society), Sept., 2010, 76, pgs. 8-9.

Svoboda, Jerry J. Get to Know Your Primary Care Doctor. Doctor's Advice (Monroe County Medical Society), Fall, 2010, Vol. 2, No. 4, pgs. 8-9.

Svoboda, Jerry J.   Before you think you can't volunteer--think again.
The Bulletin (Monroe County Medical Society), Nov., 2010, pgs. 6-7.
Svoboda, Jerry   Doctor serves Army Reserve in Afghanistan.  The Bulletin
(Monroe County Medical Society), November, 2010, 76, pgs. 22-23.
Svoboda, Jerry J. Circulation Problems related to Sleeping.  Doctor's Advice
(Monroe County Medical Society), Winter, 2011, Vol. 2, No. 4, pgs. 4-5.
Svoboda, Jerry J. Health Care Reform--Learning to Live with Uncertainty.  The
Bulletin (Monroe County Medical Society), February, 2011, 77,  pgs.6-8.
Svoboda, Jerry J. Is 'Best Practices' the Same as 'How to Best Practice'?  The
Bulletin (Monroe County Medical Soceity), April, 2011, 77, pgs. 6-7.
Svoboda, Jerry J.  Technology and Medicine.  Doctor's Advice (Monroe County
Medical Society), Spring, 2011, Vol. 3, No. 1, pg. 7.


**Presentations:**

Injuries to the thoracic aorta from blunt trauma.  Central PA Chapter of the
American College of Surgeons, Hershey, PA, Spring, 1978.

Lysis of arterial clot by intravenous or intraarterial administration of
streptokinase.  New Jersey Vascular Society, Jersey City, NJ, March 16, 1983.

Acute and chronic mesenteric ischemia with successful revascularization.
Upstate New York Vascular Society, Syracuse, NY, Fall, 1985.

Shotgun wound of femoral artery with revascularization by dual vein graft.
Upstate New York Vascular Society, Syracuse, NY, Fall, 1986.

Inframalleolar arterial bypass.  City-wide Surgical Grand Rounds, Rochester, NY,
Spring, 1986.

Ambulatory surgery of varicose veins. 2nd Annual International Congress,
North American Society of Phlebology, New Orleans, LA, Feb. 26, 1989.

Angiography by the vascular surgeon:  safe and practical out-patient studies.  17th
Annual Symposium, Society for Clinical Vascular Surgery, Boca Raton, FL,
March 30, 1989.

Vascular access for hemodialysis.  Regional Kidney Services Center, Rochester,
NY, Jan. 11, 1990.

Basilic vein transposition:  the ideal secondary fistula.  Ohio State University
Symposium on Dialysis Access, Williamsburg, VA, May 3, 1990.

Inferior vena cava interruption: when & how? City-wide Surgical Grand Rounds, Rochester, NY, March 23, 1991.

Options, Choices, and Happenings. Pathfinders' Fellowship, Rochester, NY, November 1, 1992.

Indications and judgement in surgery: a grey area worth a closer look. City-wide Surgical Grand Rounds, Rochester, NY, March 24, 1997.

Jungle Medicine 1998: Culture Shock in Peru. Department of Medicine Grand Rounds, Park Ridge Hospital, Rochester, NY, September 22, 1998.

Address to Western NY Disability Advocacy Project Task Force, Rochester, N.Y., April, 1999.

Diagnosis and management of abdominal aortic aneurysm. Emergency services department, Lakeside Health System, Rochester, NY, April 8, 1999.

Moderator, roundtable discussion of medical ethics. Asbury First United Methodist Church, Rochester, NY, November, 1999.

The Christian Physician and Compassion. Chrisitan Physicians' Breakfast, Rochester, N.Y., November 2, 2002.

Addresses at Asbury First United Methodist Church worship services: Rochester, NY, August 13, 2000 and June 15, 2003.

Medical Outreach in Latin America, Rochester Business Journal's meeting for Health Care Achievement Awards, Hyatt Regency, Rochester, NY, April 7, 2004.

Faith Journey. Fifty Plus Class—Asbury Methodist Church, Rochester, NY. Fall, 2004.

Surgical Outreach in Latin America: You Can Do This. Surgical Grand Rounds, Robert Packer Hospital/Guthrie Clinic, Sayre, PA, March 10, 2005

Promises of the Book of John. Sunday School address, Asbury First United Methodist Church, Rochester, NY, May 1, 2005.

Step Toward Christ. Sunday worship address, Medical Ministry International, Dajabon, Dominican Republic, September 11, 2005.

Striving toward Servanthood in the Real World. Christian Physicians' Breakfast, Rochester, NY, September 24, 2005.

Leg Ulcer Diagnosis and Management in Civilian Practice, COB Speicher (Tikrit) Hospital, Iraq, September 4, 2007.

Extremity Compartment Syndrome & Fasciotomy, COB Speicher (Tikrit) Hospital, Iraq, November 6, 2007.

A Surgical Experience at COB Speicher, Iraq, Fall, 2007.  Rochester Institue of Technology, Rochester, NY, February 8, 2008  Also given as Medical Grand Rounds, Unity Health System, Rochester, NY, September 23, 2008.

U.S. Army healthcare in Afghanistan; future of  U.S. civilian healthcare.  WXXI-AM 1370 radio interview/call-in show hosted by Bob Smith.  August 13, 2010.

Personal Reflections on a Career in Medicine & Surgery.  Pre-medical Club, Nazareth College, Rochester, NY.  November 5, 2010.

Deployment to Afghanistan, Spring, 2010.  Working in the U.S. Army Medical Corps as a Trauma Surgeon.  Medical Grand Rounds, Unity Health System, Rochester, NY, November 30, 2010.

Afghanistan.  Sunday School address, Growing Spirits class.  Asbury First United Methodist Church, Rochester, NY, January 16, 2011.

## Continuing Medical Education:

American Medical Association Recognition Award in Continuing Medical Education:  1981-84, 1984-87, 1987-90, 1990-93, 1993-96, 2009-2012 (with commendation).

Advanced Cardiac Life Support (ACLS)  1984, 1996, 2005, 2010.

Advanced Trauma Life Support (ATLS)  1983, 2005.

Basic Life Support, Rochester, 1984, 89, 2002, 04, 07, and Feb., 2010.

Loma Linda Medical School, postgraduate course in surgical anatomy, 1979.

Training/credentialing in intravascular angioplasty  (Grandview Medical Center, Columbus, Ohio, 1991)

Continuing Medical Education in surgical & vascular topics,  50-150 hours/year.

**Military Activity:**

Commissioned U.S. Army Reserve, rank of Major, August 7, 2006.
Rank changed to Lieutenant Colonel, October, 2008
(correction of entry grade credit).   MOC:  61W vascular surgeon.

Officer Basic Training, Fort Sam Houston, Texas, Jan.-Feb., 2007.

Deployed: COB Speicher (Tikrit), Iraq, 8/11-11/30/2007,  U.S. Army surgeon.

FOB Salerno (Khost), Afghanistan 3/27-7/19/2010, U.S. Army surgeon.

**Volunteer activities:**

Iquitos, Peru:  medical/surgical family outreach trip, July-August, 1998.

Dominican Republic & Ecuador  annual/bi-annual surgical outreach projects,
Medical Ministries International (MMI), 1999-2009, 2011, 2012.

Assistant Medical Director, Dominican Republic MMI Projects, 2/05,
9/05, 2/06, 9/06, 2/07, 2/08, 2/09 (Los Almacigos, Dajabon,
Las Matas de Farfan, Duverge).

Medical Director, Dom.Republic MMI Dajabon Project, Feb., 2012.

Physician monthly volunteer at Mercy Outreach Center, Rochester, NY,
2000-2011.

Anguilla dialysis access project, Princess Margaret Hospital, 2003 and 2005.