UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

HARRY DAVIS, et al.,

               Plaintiffs

                                      DECISION AND ORDER

-vs-

                                        12-CV-6134 CJS

NIRAV SHAH, individually and in his official
capacity as Commissioner of the New York
State Department of Health,

               Defendant

_____

APPEARANCES

For Plaintiffs:                  Bryan D. Hetherington, Esq.
                                   Geoffrey A. Hale, Esq.
                                   Jonathan Feldman, Esq.
                                   Empire Justice Center
                                   One West Main Street, Suite 200
                                   Rochester, New York 14614

                                   Martha Jane Perkins, Esq.
                                   Sarah Jane Somers, Esq.
                                   National Health Law Program
                                   101 E. Weaver Street, Suite G-7
                                   Carrboro, North Carolina 27510

For Defendant:                  J. Richard Benitez, Esq.
                                   Office of the New York State
                                   Attorney General
                                   144 Exchange Boulevard, Suite 200
                                   Rochester, New York 14614

INTRODUCTION

This is an action brought by Medicaid recipients to challenge New York State's decision to provide Medicaid payment for prescription footwear and compression stockings to treat certain medical conditions but not others. Specifically, Plaintiffs challenge two provisions of the New York State Social Services Law: The first, § 365-a(2)(g)(iii), which provides Medicaid payment only for prescription footwear "used as an integral part of a lower limb orthotic appliance, as part of a diabetic treatment plan, or to address growth and development problems in children;" and the second, § 365-a(2)(g)(iv), which provides Medicaid payment only for compression stockings "for pregnancy or treatment of venous stasis ulcers." Plaintiffs suffer from a variety of other illnesses for which prescription footwear and compression stockings are medically necessary. Prior to the enactment of those provisions, New York's medicaid statute covered Plaintiffs' orthopedic shoes and compression stockings. However, Plaintiffs are now excluded from such coverage because their medical conditions are not listed within the two statutory provisions quoted above.

Defendant maintains that the challenged provisions reflect a reasonable legislative compromise, whereby, out of economic necessity, the State of New York limited the provision of optional items (orthopedic shoes and compression stockings) to persons with the most serious medical needs, rather than eliminating

coverage for such items altogether.[1]  However, Plaintiffs maintain that the

challenged provisions violate the federal Medicaid Act, federal anti-discrimination

laws and the U.S. Constitution.

The Court previously granted Plaintiffs' applications for preliminary injunctive

relief and class certification.  Now before the Court is Plaintiffs' motion for

summary judgment (Docket No. [#26]) and Defendant's cross-motion [#28] for

summary judgment.

BACKGROUND

New York State participates in Medicaid, which "is a jointly funded Federal

and state medical assistance program that was established by Title XIX of the

Social Security Act [("SSA")] (42 USC §§ 1396 *et seq.*)." *Jennings v.*

*Commissioner, N.Y.S. Dept. of Social Servs.*, 71 A.D.3d 98, 114, 893 N.Y.S.2d

103, 115 (2d Dept. 2010).  In that regard,

> Title XIX of the Social Security Act, 42 U.S.C. [ §§ ] 1396 [*et seq.*],
> authorizes each state to participate in a cooperative federal-state
> program for medical assistance to the needy, known as Medicaid, and
> to operate a medical assistance plan, subject to federal statutory and

---

[1]The State of New York asserts, in conclusory fashion, that it "prioritiz[ed] the allocation of Medicaid resources to those it determined to be at greatest need." Bick Aff. [#28-4] at ¶ 88. However, to the extent that Defendant is suggesting that the challenged legislative line-drawing is based on "medical necessity," the record does not support him.  In that regard, Defendant has never claimed, in this litigation, that the conditions that are now covered are actually more "serious" than Plaintiffs' conditions. *See*, e.g., Bick Affidavit [#28-4].  At most, Defendant indicates that the State chose to cover *more-common* serious conditions, while omitting coverage for *less-common* serious conditions as well as non-serious conditions. *Id*. Thus it would be more accurate to say that what the State actually did was cut expenditures by restricting coverage to certain serious conditions, while eliminating coverage for other conditions, including some that are less-serious and some that are equally-serious.  Defendant nevertheless contends that the State utilized a "reasonable standard" in denying coverage to Plaintiffs. Bick Aff. [#28-4] at ¶ 6.  As discussed further below, the Court disagrees.

regulatory guidelines. If a state chooses to participate, it must adopt a statutory plan setting forth the coverage to be extended to recipients, including the terms upon which individuals will be eligible and it must extend benefits to those who are eligible for federally-funded financial assistance, such as recipients of Supplementary Security Income (SSI) for the aged, blind and disabled, known as the "categorically needy."

*Caldwell v. Blum*, 621 F.2d 491, 494 (2d Cir. 1980).

New York's statutory plan for providing "medical assistance for needy persons" under the Medicaid program is set forth in Article 5, Title 11 of the New York Social Services Law ("NY Soc. Serv. Law"), § 363 *et seq.* As indicated above, the instant case involves NY Soc. Serv. Law § § 365-a(2)(g)(iii) & (iv), which, *inter alia*, set limits on payments for prescription footwear and compression stockings. Specifically, the statute states, in pertinent part:

2. [Medical assistance] shall mean payment of part or all of the cost of medically necessary medical, dental and remedial care, services and supplies, as authorized in this title or the regulations of the department, which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with such person's capacity for normal activity, or threaten some significant handicap and which are furnished an eligible person in accordance with this title and the regulations of the department. Such care, services and supplies shall include the following medical care, services and supplies, together with such medical care, services and supplies provided for in subdivisions three, four and five of this section, and such medical care, services and supplies as are authorized in the regulations of the department:

* * *

(d) home health services provided in a recipient's home and prescribed by a physician . . . .

* * *

(g) sickroom supplies, eyeglasses, prosthetic appliances and dental

4

> prosthetic appliances furnished in accordance with the regulations of the department; provided further that: . . . *(iii) prescription footwear and inserts are limited to coverage only when used as an integral part of a lower limb orthotic appliance, as part of a diabetic treatment plan, or to address growth and development problems in children; and (iv) compression and support stockings are limited to coverage only for pregnancy or treatment of venous stasis ulcers*;

McKinney's Soc. Serv. L. § 365-a(2)(g)(iii) & (iv) (West 2013) (emphasis added).

New York State does "not allow exceptions to [the aforementioned] defined benefit limitations" concerning orthopedic footwear and compression stockings. In that regard, the pertinent regulation states:

> (g) Benefit limitations. The department shall establish defined benefit limits for certain Medicaid services as part of its Medicaid State Plan. The department shall not allow exceptions to defined benefit limitations. The department has established defined benefit limits on the following services:
>
> (1) Compression and surgical stockings are limited to coverage during pregnancy and for venous stasis ulcers.
>
> (2) Orthopedic footwear is limited to coverage in the treatment of children to correct, accommodate or prevent a physical deformity or range of motion malfunction in a diseased or injured part of the ankle or foot; in the treatment of children to support a weak or deformed structure of the ankle or foot; as a component of a comprehensive diabetic treatment plan to treat amputation, ulceration, pre-ulcerative calluses, peripheral neuropathy with evidence of callus formation, a foot deformity or poor circulation; or to form an integral part of an orthotic brace.[2]

18 NYCRR § 505.5(g)(1) & (2) (emphasis added).

---

[2] As the foregoing quotes illustrate, the statute and the implementing regulation use the terms "orthotic appliance" and "orthotic brace" interchangeably.

In 2011, New York State enacted the statutory and regulatory amendments that Plaintiffs are challenging in this lawsuit, as part of an overall cost-cutting review of the State's Medicaid services. *See, generally*, Bick Aff. [#28-4]. In considering whether to limit coverage for orthopedic shoes and compression stockings, the State observed that,

> [w]ith respect to orthopedic footwear, the Medicaid program was paying for orthopedic footwear even for Medicaid recipients whose medical need for the footwear was marginal and could be met, in any event, with off-the-shelf footwear. For example, in [fiscal year] 2010-11 alone, nearly half of the Medicaid payments made for orthopedic footwear were for claims in which the recipient's primary diagnosis was hammertoes or bunions[, which] are relatively common medical conditions. They are also relatively mild medical conditions. Alternatives to Medicaid funded orthopedic footwear exist for patients with these complaints. Wide-toe shoes that would accommodate hammertoes and bunions are readily available off-the-shelf and are relatively inexpensive.
>
> With respect to compression and support stockings, a similar utilization problem prevailed. The Medicaid program was paying for compression or support stockings to address relatively less serious and common complaints, such as varicose veins or to comfort aching legs.

Bick Aff. [#28-4] at ¶¶ 66-68. The State contends that it chose to limit coverage to persons with a more-serious medical need for orthopedic shoes and compression stockings, such as diabetics, children, and pregnant women. *Id*. at ¶¶ 73-75. The State also considered that the related Medicare program imposed limits on orthopedic footwear similar to those being challenged in this action, and that the Medicare program's policy with regard to compression stockings was even more

restrictive than that being challenged here, since it only provided compression stockings for persons suffering from "open venous stasis ulcers." *Id.* at ¶¶ 72-75. The State maintains that by making changes to its Medicaid statue, including the subject changes pertaining to orthopedic shoes and compression stockings, it saved $14.6 million, thereby "avoiding other cuts in State Medicaid spending including the possible elimination of optional Medicaid services." *Id.* at ¶ 78. That is, the State chose to restrict the coverage of optional services, rather than eliminate them entirely.

Plaintiffs do not suffer from the conditions covered by Soc. Serv. L. § 365-a(2)(g)(iii) & (iv) or 18 NYCRR § 505.5(g). Instead, Plaintiffs suffer from conditions including multiple sclerosis, paraplegia, lymphedema, cellulitis, psoriatic arthritis, and trans-metatarsal amputation,[3] for which their doctors have prescribed either orthopedic footwear or compression stockings. Amended Complaint [#34] at ¶¶ 2-7. Because those medical conditions are not listed in the challenged statute or regulation, Plaintiffs are not eligible to receive prescription footwear or compression stockings under the foregoing provisions, even though it is undisputed that such footwear and stockings are medically necessary[4] for Plaintiff's treatment. Plaintiffs maintain that,

> [w]ithout these medically necessary treatments, [they] face a high

---

[3] As mentioned above, Defendant has not specifically claimed that these conditions are less "serious" than the conditions covered under the statute.

[4] There has been no attempt in this action to compare Plaintiffs' conditions with those conditions covered under the statute in terms of "medical necessity."

likelihood of hospitalizations to address life-threatening infections and other preventable conditions[, and that as] a result of Defendant's policy and regulation, [they] are likely to be institutionalized in nursing homes and rehabilitation centers in order to be treated for the very conditions the eliminated items would have prevented at much lower cost.

Amended Complaint [#34] at ¶ 11.[5] Plaintiffs further maintain that the State of New York never informed them personally of this change in coverage. Instead, Plaintiffs only learned of the change when shoe and stocking providers, who had been notified of the change in coverage by the State, refused to fill their orders.

On March 14, 2012, Plaintiffs commenced the instant action. Plaintiffs maintain that Soc. Serv. L. § 365-a(2)(g)(iii) & (iv) or 18 NYCRR § 505.5(g) "violate federal Medicaid and disability discrimination laws." Amended Complaint [#34] at ¶ 12. In that regard, Plaintiffs contend that the subject provisions violate four separate aspects of Title XIX: 1) the "reasonable standards" provision, 42 U.S.C. § 1396(a)(17); 2) the "comparability requirement," 42 U.S.C. § 1396a(a)(10)(B); 3) the "home health services" requirement, 42 U.S.C. § § 1396a(a)(10)(A), 1396a(a)(10)(D) and 1396d(a)(4); and 4) the due process requirement, 42 U.S.C. § 1396a(a)(3), which incorporates the Fourteenth Amendment's Procedural Due Process Clause.[6] Plaintiffs further contend that the challenged provisions discriminate against them on the basis of disability, in violation of Title II of the

---

[5]While opposing Plaintiff's motion, Defendant has not challenged Plaintiffs' factual assertions.

[6]*See*, 42 C.F.R. § 431.205(d) ("The hearing system must meet the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970), and any additional standards specified in this subpart.").

Americans With Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Section 504").

The Complaint seeks declaratory and injunctive relief, attorney's fees, costs and disbursements on behalf of "[a]ll current and future New York State Medicaid recipients for whom Defendant has directly or indirectly failed to provide coverage for medically necessary orthopedic footwear and compression stockings as a result of New York Soc. Serv. Law § 365-a(2)(g)(iii) and (iv) and regulations and policies promulgated thereto." Amended Complaint [#34] at ¶ 22. More specifically, Plaintiffs seek a declaratory ruling that, as detailed earlier, the subject New York statute and regulation violates the Medicaid Act, the ADA and Section 504. Plaintiffs also seek a permanent injunction prohibiting Defendant from implementing and enforcing New York Soc. Serv. Law § 365-a(2)(g)(iii) and (iv), and 18 N.Y.C.R.R. § 505.5(g)(1) and (2), and requiring him to issue appropriate notices to Medicaid suppliers and recipients.

On May 3, 2012, the Court issued a Decision and Order [#15] granting preliminary injunctive relief on behalf of three Plaintiffs (Harry Davis, Rita-Marie Geary and Patty Poole). In granting such relief, the Court found, in pertinent part, that Plaintiff's were likely to succeed on their claim under the "home health services" provision, 42 U.S.C. § 1396a(a)(10)(D), "since they [were] being denied coverage of medically-necessary equipment on the basis of their particular illness, without any opportunity to request an exception." Decision and Order [#15] at p. 13. Significantly, though, while Defendant had opposed Plaintiffs' motion for

preliminary injunctive relief, he did so primarily on technical grounds, and did not challenge Plaintiffs' assertion that "home health services" included orthopedic shoes and compression stockings. As discussed further below, Defendant now denies that orthopedic shoes and compression stockings qualify as home health services. Instead, Defendant now argues that orthopedic shoes and compression stockings are "prosthetics," which the State is not required to provide under the Medicaid Act's "home health services" provision.

After the Court granted preliminary injunctive relief to three named Plaintiffs, the parties stipulated that Defendant would also provide medically-necessary orthopedic footwear and compression stockings to other individuals, that Plaintiffs' counsel brought to Defendant's attention, during the pendency of this litigation. *See*, Docket Nos. [#19] & [#30].

On October 1, 2012, Plaintiffs filed the subject motion [#26] for summary judgment. On November 7, 2012, Defendant filed the subject cross-motion [#28] for summary judgment. On November 28, 2012, Plaintiffs filed a reply/response [#31]. Defendant did not file a reply to [#31], though the Court had granted him an opportunity to do so. *See*, Scheduling Order [#22]. In November 2013, the Court also permitted the parties to submit supplemental briefings concerning the appropriate standard of review to be applied to the State's interpretation of the federal Medicaid laws.

DISCUSSION

Plaintiffs are seeking summary judgment, granting them declaratory and permanent injunctive relief. Summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

"To obtain a permanent injunction, a plaintiff must succeed on the merits and show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) (citations and internal quotation marks omitted). In opposition to Plaintiffs' summary judgment motion, which seeks declaratory and permanent injunctive relief,[7] Defendant disputes the merits of Plaintiffs' claims, but does not otherwise challenge Plaintiffs' entitlement to permanent injunctive relief if they succeed on those claims. That is, assuming *arguendo* that Plaintiffs can show their entitlement to judgment on the merits, Defendant has not disputed that Plaintiffs lack an adequate remedy at law or that they will suffer irreparable harm if a permanent injunction is not granted.[8]

---

[7] *See*, Plaintiffs' Memo of Law [#26-2] at p. 25.

[8] *See*, Defendant's Memo of Law [#28-1].

*Plaintiffs' Claim Under the Home Health Services*
*Provision, 42 U.S.C. § 1396a(a)(10)(D)*

The Medicaid Act, 42 U.S.C. § 1396a(a)(10)(A) and 42 U.S.C. §

1396d(a)(4), together require participating states to provide categorically needy

persons with "medical assistance," including "nursing facility services."

Participating states can also opt to provide nursing facility services to medically

needy persons. Furthermore, 42 U.S.C. § 1396a(a)(10)(D) requires participating

states to provide "home health services" to any person entitled to receive "nursing

facility services."[9]  The applicable federal regulation indicates that "home health

services" include "[m]edical supplies, equipment, and appliances suitable for use in

the home." 42 C.F.R. § 440.70(b)(3).

Defendant admits that, "[i]n New York, the State Medicaid plan provides

payment for nursing facility services provided to the categorically needy as well as

the medically needy," and that "[t]he state must thus provide payment for home

health services provided to the categorically needy and medically needy who are

appropriate for such services." Def. Memo of Law [#28-1] at p. 5.  It is undisputed

that Plaintiffs are either categorically needy or medically needy.  Defendant

maintains, however, that 42 U.S.C. § 1396a(a)(10)(D) does not require New York to

provide Plaintiffs with orthopedic shoes or compression stockings, because such

shoes and stockings are not "home health services," and specifically, they are not

---

[9]Specifically, that section states: "A state plan for medical assistance must . . . provide . . . for the inclusion of home health services for any individual who, under the State plan, is entitled to nursing facility services[.]" 42 U.S.C.A. § 1396a(a)(10)(D) (West 2012).

"[m]edical supplies, equipment, and appliances suitable for use in the home."[10]
Instead, Defendant maintains, such shoes and stockings are "prosthetics," as
defined under federal law, which are not covered by 42 U.S.C. § 1396a(a)(10)(D).

Defendant contends that orthopedic shoes and compression stockings do not fit
within the federal government's understanding of "medical supplies, equipment and
appliances." On this point, Defendant admits that the phrase "medical supplies,
equipment and appliances" is not defined in the federal Medicaid Act or regulations, but
contends that the federal Centers for Medicare & Medicaid Services ("CMS"), an
agency of the U.S. Department of Health and Human Services ("HHS"), has proposed a
definition, which is intended "to better align with the Medicare Program's definition of
durable medical equipment found at [42 C.F.R. § ]414.202." Def. Memo of Law [#28-1]
at 6 (*citing* 76 Federal Register at 41034). The proposed rule, which the Court is

---

[10]Alternatively, Defendant contends that even if such shoes and stockings were "[m]edical
supplies, equipment, and appliances suitable for use in the home," that Plaintiffs would not be
entitled to receive them because "[n]one of the plaintiffs are recipients of home health services, in
order for them to insist on mandatory 'medical supplies, equipment and appliances." Def. Memo of
Law [#28-1] at p. 6. This argument lacks merit because it assumes that a beneficiary must first
receive "home health services" before he can receive "medical supplies, equipment and
appliances," but in fact, "medical supplies, equipment and appliances" are themselves a type of
home health services. *See*, 42 C.F.R. § 440.70(b); *but see, Lankford v. Sherman*, 451 F.3d 496,
504-505 (8th Cir. 2008) (Which can be read to suggest that the two things are separate: "If a
recipient receives home health services, the state also must provide "medical supplies, equipment,
and appliances suitable for use in the home" as part of the program."). The regulation, 42 C.F.R. §
440.70(b), lists four types of "home health services" that, in addition to "medical supplies,
equipment, and appliances," includes "nursing service," "home health aide service" and "physical
therapy." The Court does not understand the applicable federal law to require that a beneficiary
must receive one of those other types of "home health services" before he can receive "medical
supplies, equipment and appliances." Rather, as Plaintiffs' correctly observe, "[f]ederal law clearly
obligates Medicaid participating states to cover home health services for recipients who are
"entitled to" nursing facility care, not those who are "in receipt of" home health care." Pl. Memo of
Law [#31] at p. 3.

required to give "respectful consideration,"[11] and with which Plaintiffs do not take issue, states, in pertinent part:

> We propose that supplies are defined as "health care related items that are consumable or disposable, or cannot withstand repeated use by more than one individual." We propose that medical equipment and appliances are "items that are primarily and customarily used to serve a medical purpose, generally not useful to an individual in the absence of an illness or injury, can withstand repeated use, and can be reusable or removable."

76 F.R. 41032-01, 2011 WL 2678714 (Jul. 12, 2011).

Defendant contends that those definitions are very similar to the State's definitions for "durable medical equipment" and "medical/surgical supplies." In that regard, Defendant states:

> The Department has long defined durable medical equipment as follows: *Durable medical equipment* means devices and equipment, other than prosthetic or orthotic appliances, which have been ordered by a practitioner in the treatment of a specific medical condition and which have all of the following characteristics: (i) can withstand repeated use for a protracted period of time; (ii) are primarily and customarily used for medical purposes; (iii) are generally not useful to a person in the absence of an illness or injury; and (iv) are usually not fitted, designed or fashioned for a particular individual's use. Where equipment is intended for use by only one person, it may be either custom-made or customized.
> ***
> The Department's regulations have long defined 'medical/surgical supplies' as follows: Medical/surgical supplies means items for medical use other than drugs, prosthetic or orthotic appliances, durable medical equipment, or orthopedic footwear which have been ordered by a

---

[11] *See, Wisconsin Dept. of Health and Family Services v. Blumer*, 534 U.S. 473, 497, 122 S.Ct. 962, 976 (2002) (Indicating that a proposed rule by the Secretary of Health and Human Services "warrant[ed] respectful consideration," and that reliance on the Secretary's significant expertise was particularly appropriate "in the context of a complex and highly technical regulatory program.") (citations and internal quotation marks omitted).

practitioner in the treatment of a specific medical condition and which are usually: (i) consumable; (ii) nonreusable; (iii) disposable; (iv) for a specific rather than incidental purpose; and (v) generally have no salvageable value.

McCloskey Aff. [#28-3] at ¶ ¶ 32, 34 (quoting 18 NYCRR § 505.5(a)(1)&(2)).

Defendant contends that orthopedic shoes and compression stockings do not fit within those definitions. Defendant further indicates that the State's regulations contain a definition for "orthopedic footwear" that is separate from the definitions for "durable medical equipment" and "medical/surgical supplies." *See*, *id*. at ¶ 35 (citing 18 NYCRR § 505.5(a)). Additionally, the State's provider manual lists "prescription footwear" separately from "durable medical equipment" and "medical/surgical supplies." McCloskey Aff. [#28-3] at ¶ 35.

Defendant further maintains that orthopedic shoes and compression stockings more clearly fall under the federal Medicaid regulations' definition of "prosthetic devices," which New York is not required to provide under 42 U.S.C. § 1396a(a)(10)(D). That definition states, in pertinent part:

"Prosthetic devices" means replacement, corrective, or supportive devices prescribed by a physician or other licensed practitioner of the healing arts within the scope of his practice as defined by State law to– (1) Artificially replace a missing portion of the body; (2) Prevent or correct physical deformity or malfunction; or (3) Support a weak or deformed portion of the body.

42 C.F.R. § 440.120(c). From this definition, Defendant maintains, the "salient characteristics" of prosthetic devices are that they are "preventive," "corrective" or "supportive." McCloskey Aff. [#28-3] at ¶ 25.

15

Defendant states that orthopedic shoes are similarly preventive, corrective and supportive.  In that regard, the State defines  "orthopedic footwear," in pertinent part, as follows:

> **Orthopedic footwear** means shoes, shoe modifications, or shoe additions which are used as follows: in the treatment of children, to _correct_, accommodate or _prevent_ a physical deformity or range of motion malfunction in a diseased or injured part of the ankle or foot; in the treatment of children, to _support_ a weak or deformed structure of the ankle or foot; as a component of a comprehensive diabetic treatment plan to treat amputation, ulceration, pre-ulcerative calluses, peripheral neuropathy with evidence of callus formation, a foot deformity or poor circulation; or to form an integral part of an orthotic brace.

18 NYCRR § 505.5(a)(3)&(4) (emphasis added).  Defendant indicates that compression stockings are similarly "preventive" and "supportive," since "[t]hey may prevent varicose veins from stretching and hurting and may prevent venous stasis ulcers.  They may [also] comfort aching and tired legs by supporting a weak portion of the body." McCloskey Aff. [#28-3] at ¶ 43.  Defendant further contends that the State's "provider manual has long classified [compression stockings] as prosthetics."[12] _Id_. at ¶ 44.

Plaintiffs do not dispute that "prosthetics" are optional services that fall outside of the "home health services" requirement, 42 U.S.C. § 1396a(a)(10)(D).  However, they

___

[12]Defendant explains that compression stockings are actually two types of stockings – "compression stockings," which are prescription custom-fitted stockings, and "support stockings," also known as "surgical stockings," which are not custom fitted, and are sold over-the-counter. McCloskey Aff. [#28-3] at ¶ ¶ 39-40.  Defendant contends that both types of stockings fall within the federal definition of prosthetics, as explained above.  However, Defendant indicates that while "compression stockings" are listed in the State's provider manual as "prosthetics," support stockings are listed as "medical/surgical supplies," not because they are "supplies," but in order to make them more readily available to beneficiaries. _Id_. at ¶ 46-47 ("The sole reason that the Department's provider manual lists support stockings as medical/surgical supplies rather than as prosthetics is to enable pharmacies to dispense these items to medicaid recipients [rather than having the medicaid recipients have to obtain them from a medical equipment/supply dealer.]").

maintain that Defendant is mistaken in claiming that orthopedic shoes and compression stockings are "prosthetics." Plaintiffs insist that such shoes and stockings are "durable medical equipment," and thus covered by the "home health services" requirement. *See*, Pl. Memo of Law [#31] at pp. 4-9. In support of their position, Plaintiffs point to certain features of New York's Medicaid program, which, they argue, contradict Defendant's contention that orthopedic shoes and compression stockings are treated as prosthetics under state law. *See, id.* at p. 4 ("Defendant's regulations, written guidance to providers, and model contracts for Medicaid managed care organizations all clearly treat compression stockings and orthopedic footwear as Durable Medical Equipment (DME). As such, they fall squarely within the federal mandatory home health benefit[.]").

On this issue, Plaintiffs first point out that 18 NYCRR § 505.5, titled "*Durable medical equipment; medical/surgical supplies; orthotic and prosthetic appliances; orthopedic footwear*," provides separate definitions for "orthotic appliances and devices," "orthopedic footwear" and "prosthetic appliances and devices." Pl. Memo of Law [#31] at p. 5. Because of that, Plaintiffs maintain, "the regulation distinguishes orthopedic footwear from any sort of 'prosthetic appliances and devices' and contradicts Defendant's current attempt to redefine these items as optional 'prosthetics.'" *Id*. On the other hand, the regulation also separately defines "durable medical equipment" and "medical/surgical supplies," which undercuts Plaintiffs' contention that orthopedic shoes fit under either of those categories.

Plaintiffs next maintain that "Defendant's policy guidance to [Medicaid] providers" is at odds with the notion that orthopedic shoes and compression stockings are

17

"prosthetics." Specifically, Plaintiffs refer to Defendant's "provider manual," which covers "DMEPOS," which is an abbreviation for "medical supplies, durable medical equipment, orthopedic footwear, prosthetic and orthotic appliances and devices." Pl. Memo of Law [#31] at p. 5. According to Plaintiffs, this manual demonstrates that "neither orthopedic footwear nor compression stockings are exclusively categorized as 'prosthetics.' Rather, these items are variously subsumed within multiple subsections of Defendant's over-all DME[POS] policy." *Id*. at p. 6. Plaintiffs indicate that the manual does not include orthopedic shoes under the category of "prosthetics," but does include some compression stockings in that category.

Plaintiffs further maintain that the State's "Model Contracts for Medicaid Managed Care and Managed Long Term Care" "distinguish orthopedic footwear [and orthotics] from prosthetics," and define "prosthetics" as "appliances or devices which replace or perform the function of any missing part of the body." Pl. Memo of Law [#31] at pp. 6-7. Plaintiffs state that such definition does not fit orthopedic shoes or compression stockings, since such shoes and stockings do not "'replace' any missing body part." *Id*. at p. 7.[13] Plaintiffs thus contend that Defendant's own policies and documents distinguish orthopedic shoes and compression stockings from

_____

[13]That assertion, however, seems inconsistent with Plaintiffs' description of the "orthopedic shoes" requested for Plaintiff Harry Davis, which seem to "replace" amputated sections of his feet. *See, e.g.*, Complaint [#1] at ¶ 17 ("Plaintiff Davis is unable to walk without prescription molded shoes for the stumps that remain of his feet."); Docket No. [#3-2] at ¶ ¶ 16-17 ("Plaintiff Harry Davis suffered a transmetatarsal amputation of both feet roughly ten years ago[.] . . . . As a result, Mr. Davis is left with stumps instead of feet. Mr. Davis requires specially molded shoes in order to walk.") (citations omitted).

18

"prosthetics."[14]

Consequently, as framed by the parties, the issue is whether orthopedic shoes and compression stockings are "home health services," in which case the State is required to provide them under 42 U.S.C. § 1396a(a)(10), or whether they are "prosthetic devices," in which case the State is not required to provide them under that provision. The Court's prior Decision and Order [#15] granting preliminary injunctive relief provides no guidance on this point. In that regard, in their motion for summary judgment, Plaintiffs seek to rely on the Court's earlier ruling, in its Decision and Order granting preliminary injunctive relief, that orthopedic shoes and compression stockings are "home health services." Plaintiffs state, in pertinent part: "The Court has already found that, for purposes of the preliminary injunction, Plaintiffs have established the likelihood of success that the challenged statute and Defendant's challenged policies violated the home health requirement in 42 U.S.C. § 1396a(a)(10)(D)." Pl. Memo of Law [#26-2] at p. 14. However, in its prior

---

[14] Plaintiffs also assert, as part of their argument concerning the "home health services" provision, that "it is well settled that a needed medical service may fall within multiple Medicaid service categories -- mandatory services and optional services the state has elected to cover -- and that it must be covered if it does fall within one or more of those categories." Pl. Memo of Law [#31] at p. 8. For that proposition, Plaintiffs cite the following cases: *Hern v. Beye*, 57 F.3d 906, 910 (10th Cir. 1995), *Conley v. Dept. of Health*, 287 P.3d 452, 465-468 (Utah Ct. App. 2012) and *Fred C. v. Texas Health and Human Services Commission*, 924 F.Supp. 788, 791-792 (W.D. Tex. 1996). However, the Court does not find any of those cases to be on point or persuasive, with regard to the issue involving the home health services requirement. *Hern v. Beye* is inapposite because it involved a medical service that admittedly fell under a "mandatory coverage" category. Moreover, the issue in *Hern* was under what circumstances a state could deny coverage for a procedure that fell under a mandatory coverage category, not whether the service was mandatory. The *Fred C.* decision was vacated by the Fifth Circuit, at 117 F.3d 1416 (5th Cir. 1997), and in any event, asserted that "home health care" was an "optional service," which the parties to this action do not maintain. *Conley* is a Utah state court decision that is obviously not binding on this Court, and, in any event, involved the "reasonable standards" and "comparability" requirements, not the home health services requirement (the defendant admitted that the service at issue met the definition of durable medical equipment).

19

Decision and Order, the Court did not perform any analysis in reaching its conclusion that orthopedic shoes and compression stockings were "home health services." Instead, it merely made that finding based on Plaintiffs' representations to that effect, and Defendant's failure to argue the point.[15] The Court noted, moreover, that it was making its finding of "likelihood of success" without prejudice to Defendant having an opportunity to revisit the issue "after comprehensive briefing." Specifically, the Court stated that given

> the fact that Defendant had a very limited time to prepare a response
> to the motion [for preliminary injunctive relief], the Court does find,
> based on its analysis, that Plaintiffs have demonstrated a likelihood of
> success on their Section 1983 claim under 42 U.S.C. §
> 1396a(a)(10)(D), but makes this ruling without prejudice to the parties
> re-visiting the issue later in the case after comprehensive briefing[.]

Decision and Order [#15] at p. 12, n. 3. (internal quotation marks omitted). Accordingly, the Court's prior Decision and Order [#15] really does not provide any support for Plaintiff's contention that orthopedic shoes and compression stockings are "home health services."

Defendant interprets the federal Medicaid laws to indicate that orthopedic shoes and compression stockings are "prosthetic devices," 42 U.S.C. § 1396d(a)(12), as defined by 42 C.F.R. § 440.120(c). Additionally, Defendant interprets the phrase, "[m]edical supplies, equipment, and appliances suitable for use in the home,"

---

[15] Defendant's primary contention in opposing the application for preliminary injunctive relief was that Plaintiff's could not sue under § 1983 to enforce the subject provisions of the Medicaid Act. The Court found to the contrary, and Defendants had not raised that issue again in connection with the summary judgment motions.

contained in 42 C.F.R. § 440.70(b)(3), to exclude orthopedic shoes or compression stockings.  Plaintiffs are essentially asking the Court to review Defendant's interpretation of the federal Medicaid Act, and in that regard, one of two standards of review may apply – the deferential standard or the *de novo* standard.

The deferential standard is an outgrowth of the *Chevron* deference rule,[16] and applies where the Secretary of HHS has agreed with a state's interpretation of the Medicaid Act.  For example, in *Perry v. Dowling*, 95 F.3d 231, 235-236 (2d Cir. 1996), the Second Circuit found that it was appropriate to give deference to a state's interpretation of the Medicaid Act, for three reasons: 1) Medicaid is a joint federal-state program; 2) the Secretary of HHS had approved the state's Medicaid Plan; and 3) the Secretary had submitted a declaration concurring with the state's interpretation of the Medicaid Act.[17]  In a subsequent decision, the Second Circuit

---

[16] *See, Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-844, 104 S.Ct. 2778, 2781-2782 (1984) ("When a court reviews a[ ] [federal] agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.  If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.  . . .  If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.  Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit.  In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.") (citations and footnotes omitted).  Congress has not directly addressed the issue before the Court.

[17] *See, id.* ("When the federal-statute interpretation is that of a state agency and 'no federal agency is involved,' deference is not appropriate. *See Turner v. Perales*, 869 F.2d 140, 141 (2d

21

indicated that it might also be proper to accord such deference in a situation where the Secretary's approval of the state's interpretation of the Medicaid Act was implicit, and based only on the Secretary's approval of the state's Medicaid Plan. *Community Health Center v. Wilson-Coker*, 311 F.3d 132, 140 (2d Cir. 2002). In that case, however, the Second Circuit cautioned that district courts should consider whether the Secretary's approval of a state plan actually indicates that the Secretary considered and agreed with the state interpretation being challenged:

> The district court therefore should consider whether to defer to the implicit judgment of the Secretary that a state plan complies with federal law. In making this determination, the district court should bear in mind . . . [that] [d]eference, however, even at it's highest levels, is not a 'rubber stamp.' In assessing the reasonableness of CMS's decision, the district court may consider the materials submitted by [the state] in support of its plan, and the factors considered by CMS in evaluating those materials.

*Id.*, 311 F.3d at 140 (citations omitted).

In this case, the Court finds that the deferential standard of review is appropriate. On this point, CMS has approved New York's Medicaid Plan, including various amendments which contain references to the challenged legislation concerning orthopedic shoes and compression stockings. Moreover, there is evidence that CMS actually considered such legislation, and agreed that it was

---

Cir.1989) (per curiam). . . . [However,] [i]n these circumstances [involving Medicaid, a "joint federal-state program"], in which the state has received prior federal-agency approval to implement its plan, the federal agency expressly concurs in the state's interpretation of the statute, and the interpretation is a permissible construction of the statute, that interpretation warrants deference.") (citations omitted).

consistent with the Medicaid Act.  In that regard, an affidavit from New York's

Acting Director of Operations, Office of Health Insurance Programs, indicates that

the State submitted a proposed plan amendment to CMS, specifically addressing

the change in coverage for orthopedic shoes and compression stockings, and that

CMS informed the state that it was not necessary to submit the proposed

amendment, since the State had the inherent authority to limit such coverage. *See*,

Bick Aff. [#28-4] at ¶ 56 ("CMS advised the Department that it was not required to

submit for CMS's approval a proposed plan amendment that reflected these benefit

limits because such changes in medical necessity criteria were within the State's

purview."). Presumably, if the proposed changes in coverage violated the "home

health services" provision, CMS would have said so.  Since it did not, the Court

gives substantial deference to CMS's interpretation of the federal Medicaid Act and

concludes that the challenged provisions do not violate 42 U.S.C. §

1396a(a)(10)(D).

As mentioned above, the second possible standard of review which the

Court could apply is the *de novo* standard, pursuant to which, a court considers

whether the state agency's actions are consistent with federal law. *See, Turner v.

Perales*, 869 F.2d at 141 (Indicating that under *de novo* review of a state's

interpretation of a federal statute, "the question is whether the state law and

implementing regulations are consistent with federal law."). Alternatively, even

assuming *arguendo* that the appropriate standard of review was *de novo*, the Court

would nevertheless find that the subject legislation is consistent with the Medicaid

Act and therefore does not violate the home health services provision. Plaintiffs'

argument on this point is largely devoted to pointing out apparent inconsistencies,

in the State's own documents, such as provider manuals, as to how the State

categorizes orthopedic shoes and compression stockings, for supply and billing

purposes.[18] Plaintiffs spend relatively little time attempting to argue that

Defendant's categorization of orthopedic shoes and compression stockings as

prosthetics is inconsistent with the federal Medicaid Act. On that point, Plaintiffs

argue only that the challenged legislation is bad from a policy standpoint, since it

would be more "cost effective" to provide orthopedic shoes and compression

stockings to Plaintiffs in order to prevent them from developing more serious

ailments that might require hospitalization.[19] Apart from that, Plaintiffs contend

that orthopedic shoes and compression stockings fit within the broad definition of

"medical equipment and appliances" proposed by CMS, discussed above.[20]

However, the Court agrees with Defendant that orthopedic shoes and compression

stockings may be properly categorized as prosthetic appliances, which are not

---

[18] *See*, Pl. Memo of Law [#31] at p. 6 ("Contrary to Defendant's assertion, neither orthopedic footwear nor compression stockings are exclusively categorized as 'prosthetics.' Rather, these items are variously subsumed within multiple subsections of Defendant's over-all DME policy."). The Court does not view these inconsistencies as necessarily helpful to Plaintiff's claim, since the issue is not whether the State's documentation is perfectly consistent, but rather, whether the State is violating the Medicaid Act by failing to provide home health services as defined by the Secretary.

[19] *See, e.g.*, Pl. Stmt. of Facts ¶ 28 ("Compression stockings offer a cost-effective way to prevent far more complicated and expensive treatments and hospitalizations.").

[20] *See*, Pl. Memo of Law [#31] at p. 7 ("Notably, the orthopedic footwear and compression stockings at issue here indisputably meet the proposed CMS definition: they serve a primarily medical purpose, are not useful in the absence of an illness or injury, can withstand repeated use, and can be reusable or removable.")

covered by the home health services provision, 42 U.S.C. § 1096a(a)(10)(D).  More

specifically, the Court agrees with Defendant that orthopedic shoes and

compression stockings conform to the more-specific definition of "prosthetic

devices" set forth at 42 C.F.R. § 440.120(c), since both are "corrective or supportive

devices" that "correct physical deformity or malfunction" or "support a weak or deformed

portion of the body."  Consequently, Defendant's assertion, that orthopedic shoes and

compression stockings are not "home health services," appears consistent with the

Medicaid Act.  Additionally, the Court notes that at least one other federal court

decision, as well as one other federal regulation, treat orthopedic shoes as a category

of prosthetic appliances. *See, Budnicki v. Beal*, 450 F.Supp. 546, 551 (D.C.Pa. 1978)

("Before April 9, 1977, Pennsylvania provided prosthetic devices, including orthopedic

shoes, to only categorically needy recipients."); 38 C.F.R. § 17.150 (listing orthopedic

shoes under the heading "Prosthetic and similar appliances").  For all of these reasons,

the Court alternatively finds, under *de novo* review, that Plaintiffs have not shown that

Defendant's challenged interpretation is inconsistent with the Medicaid Act.  Defendant

is therefore entitled to summary judgment on this claim.

> *Plaintiffs' Claim Under the Reasonable Standards Provision,*
> *42 U.S.C. § 1396a(a)(17)*

Plaintiffs alternatively maintain that the challenged provisions violate the

Medicaid Act's "reasonable standards" provision, 42 U.S.C. § 1396a(a)(17), since they

"eliminat[e] coverage for compression stockings and orthopedic footwear without an

opportunity to obtain an individualized determination  of medical necessity." Amended

Complaint [#34] at ¶ 152.  Plaintiffs contend that the challenged provisions are

"arbitrary" and "unreasonable," for the following reasons:

> The State's policy will cover orthopedic shoes for someone with diabetes and peripheral neuropathy, but not peripheral neuropathy without diabetes; a patient with swelling in his or her legs so severe that venous stasis ulcers have already developed will get compression stockings, but a patient with lymphedema who has already suffered massive cellulitic infection that required surgical treatment at Defendant's expense will not – even when Defendant's own health policy strongly recommends use of compression stockings to treat the condition. Such distinctions have nothing to do with medical necessity, are improperly based solely on diagnosis or condition, and therefore violate the reasonableness requirement in 42 U.S.C. § 1396a(a)(17).

Pl. Memo of Law [#26-2] at pp. 17-18; *see also*, Pl. Memo of Law [#31] at p. 11

("Defendant's policy regarding coverage of compression stockings and orthopedic footwear only for those few Medicaid beneficiaries who meet one of the limited coverage categories based solely on diagnosis and condition clearly violates 42 C.F.R. § 440.230(c)"). Essentially, Plaintiffs maintain that where two groups of people both need a particular medical service provided under Medicaid, the state cannot provide the service to one group, but not to the other, based on diagnosis.

In response, Defendant agrees that the provision of orthopedic shoes and compression stockings is subject to the Medicaid Act's "reasonable standards" provision. However, Defendant indicates that the challenged legislation is permissible under 42 C.F.R. § 440.230(d). In that regard, the subject regulation states:

**§ 440.230 Sufficiency of amount, duration, and scope.**

(a) The plan must specify the amount, duration, and scope of each service that it provides for– (1) The categorically needy; and (2) Each covered group of medically needy.

26

(b) Each service must be sufficient in amount, duration, and scope to reasonably achieve its purpose.

(c) The Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope of a required service under §§ 440.210 and 440.220 to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition.

(d) The agency may place appropriate limits on a service based on such criteria as medical necessity or on utilization control procedures.

42 C.F.R. § 440.230 (West 2013).  Defendant maintains that in the instant case, the state has a legitimate interest in "conserving limited Medicaid resources," and that it has "articulate[d] a rational basis for [having] prioritize[d] certain diagnoses and conditions over others." Def. Memo of Law [#28-1] at p. 12.[21]  Defendant further suggests that although New York has opted to provide prosthetic services, the fact that such services are "optional" under the Medicaid Act should provide the state with more leeway to limit coverage, under 42 U.S.C. § 440.230. *See*, Def. Memo of Law [#28-1] at p. 8 ("The language of the regulation also suggests that states have greater flexibility in limiting coverage of optional services based on diagnosis.").[22] Significantly, Defendant does not deny that Plaintiffs have a legitimate medical

[21] Defendant explained why the State prioritized the covered diagnoses over other, less-serious ones (*i.e.*, less medically necessary ones), such as hammertoes, bunions and varicose veins, but he did not explain why the State decided not to cover other serious conditions such as those from which Plaintiffs suffer.  At most, the record suggests that the State opted to cover what it perceived to be the most commonly-occurring conditions.

[22] The Court does not agree with that proposition. *See, Bontrager v. Indiana Family and Social Services Administration*, 697 F.3d 604, 608-612 (7th Cir. 2012) (Giving no indication that once a state decides to provide an optional dental service, the previously-optional nature of the service has any bearing on the analysis under 42 C.F.R. § 440.230(d)), *cert. den.*, 133 S.Ct. 2002 (2013).

need, for orthopedic shoes and/or compression stockings, that is at least as great as that of the persons entitled to receive those items under the statute.  Nor does Defendant dispute that if Plaintiffs are denied those services, they may end up with more serious medical issues that the State will have to treat.  Rather, Defendant contends that based upon budget concerns, the State may decide to provide medically necessary services to certain beneficiaries, but not others, based on diagnosis.  Defendant indicates that it adopted the challenged categories in an effort to weed-out persons with certain less-serious conditions, such as bunions and varicose veins,[23] and to provide services to "the *majority of people* [with more serious conditions] who need [them]." Bick Aff. [#28-4] at ¶ 73 (emphasis added)[24]; *see also, id.* at ¶ 73 ("[C]overing orthopedic footwear for diabetics will continue to provide footwear to *the majority* of people who need it.") (emphasis added).  Defendant does not dispute, though, that such limitations have resulted in persons, including Plaintiffs, with equally-serious conditions, such as chronic venous insufficiency ("CVI"), being left uncovered.[25]  The issue before the Court is whether such a policy runs afoul of the "reasonable standards" provision.

---

[23] For example, Defendant states that in 2010-2011, approximately 18% of New York's Medicaid claims for stockings were for people with varicose veins. Bick Aff. [#28-4] at ¶ 70.

[24] *See*, Bick Aff. [#28-4] at ¶ 75 ("[T]he Department determined to cover . . . compression stockings for pregnant women with severe varicosities and edema.  It determined also to cover compression stockings only when used for the treatment of open venous ulcers.  These two diagnoses – pregnancies with severe varicosities and edema and open ulcers – account for 25 percent of all Medicaid payments for compression and support stockings.") (footnotes omitted).

[25] *See*, Bick Aff. [#28-4] at ¶ 70 (Indicating that in 2010-2011, approximately seven percent (7%) of claims for stockings were for people with CVI.

The Court finds that it does. In that regard, Defendant does not dispute that orthopedic shoes and compression stockings are medically necessary for Plaintiff's medical conditions. Nor has Defendant shown that the persons currently eligible for such services are more medically needy than Plaintiffs. Defendant is therefore not relying upon that portion of 42 C.F.R. § 440.230(d) which permits states to place limits on services based on "medical necessity." Instead, it seems clear that Defendant is relying upon that regulation's reference to "utilization control procedures." In other words, Defendant maintains that a classification, based on diagnosis, that serves a majority of persons needing a service, but fails to serve others who are equally needy, is a valid "utilization control procedure." However, the Court cannot find any authority to support that view.[26] To the contrary, the law on this point is that "utilization control procedures," while not defined in the statute, consist of "prior authorization process[es], or similarly designed [processes] to control access, prevent fraud, or streamline efficiency," or "resource[s] to determine the medical necessity of a procedure." *Bontrager v. Indiana Family and*

---

[26] Defendant cites the cases *Casillas v. Daines*, 580 F.Supp.2d 235, 244 (S.D.N.Y. 2008) and *Ravenwood v. Daines*, No. 06-CV-6355-CJS, 2009 WL 2163105 (W.D.N.Y. Jul. 17, 2009), both of which involved attempts to obtain Medicaid-funded "gender reassignment" surgery. Alternatively, the plaintiffs in those actions sought "comparable" types of surgeries, that were provided for specific illnesses. For example, they sought surgical testical removal, as a component of gender reassignment surgery, since such surgery was covered for men with testicular cancer. In both actions, the complaints were dismissed. However, neither of those cases is on point, since under the statute being challenged in them, *no one* was entitled to receive gender reassignment surgery, and the state had provided various safety reasons why such surgery was expressly excluded from coverage. Essentially, the state determined that gender reassignment surgery was not medically necessary. In the instant case, certain persons are able to obtain medically-necessary orthopedic shoes and compression stockings, but certain persons are not, based solely on diagnosis.

*Social Services Administration*, 697 F.3d at 611. The subject provisions do not fall under any of those categories, and in any event, they deny coverage of medically-necessary services based solely on diagnosis. Consequently, the subject provisions violate the Medicaid Act's "reasonable standards" provision. *See*, 42 C.F.R. § 440.230(c) ("The Medicaid agency may not arbitrarily deny . . . a required service . . . to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition."). Plaintiffs are therefore entitled to summary judgment on this claim.

### Plaintiffs' Claim Under the Comparability Requirement, 42 U.S.C. § 1396a(a)(10)(B)

Plaintiffs maintain that the challenged legislation also violates the Medicaid Act's comparability requirement because it discriminates between Medicaid recipients "based on medical condition." Amended Complaint [#34] at ¶ 154. The pertinent section of the Medicaid Act states that

> the medical assistance made available to any individual described in subparagraph (A)– (i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual, and (ii) shall not be less in amount, duration, or scope than the medical assistance made available to individuals not described in subparagraph (A)[.]

42 U.S.C. § 1396a(a)(10)(B). "[T]he comparability mandate prevents discrimination against or among the categorically needy [and] applies equally to mandatory and optional medical services." *Lankford v. Sherman*, 451 F.3d at 505. In opposition, Defendant denies that the subject legislation violates the Medicaid Act, for the same reasons discussed above in the section pertaining to the

"reasonable standards" requirement. That is, Defendant contends that the State's decision not to cover illnesses, besides those listed in the statute and regulations, is permissible under 42 C.F.R. § 440.230(d), as a "utilization control procedure." Def. Memo of Law [#28-1] at pp. 8-12. However, for the same reasons already discussed, the Court disagrees, and finds that the challenged provisions violate the comparability provision, 42 U.S.C. § 1396a(a)(10)(B). Accordingly, Plaintiffs are entitled to summary judgment on this claim.

*Plaintiffs' Claim Under the Due Process Provision,*
*42 U.S.C. § 1396a(a)(3)*

Plaintiffs maintain that Defendant violated the Medicaid Act's due process provision by failing to give them personal notice, of the change in coverage pertaining to orthopedic footwear and compression stockings, or an opportunity for a hearing. Amended Complaint [#34] at ¶ 160. The pertinent statute section states that "[a] State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness[.]" 42 U.S.C. § 1396a(a)(3). The issue before the Court is whether this provision requires a state to provide individual notice, and an opportunity for a hearing, to beneficiaries whenever it amends its Medicaid laws to restrict those beneficiaries' access to services.

To the extent that Plaintiffs contend they were entitled to a hearing, the Court disagrees. *See, Rosen v. Goetz*, 410 F.3d 919, (6th Cir. 2005) (Explaining

31

that 42 C.F.R. § 431.220(b) does not require a hearing, in the absence of a factual dispute, when a state eliminates coverage under a Medicaid program); *see also*, *Washington v. DeBeaugrine*, 658 F.Supp.2d 1332, 1335 (N.D.Fla. 2009) ("[W]hen a state validly changes its law in a way that, without factual dispute, ends a person's benefits, no hearing is required.") (*citing Rosen v. Goetz*, 410 F.3d 919, 926 (6th Cir.2005)). In that regard, Plaintiffs have not claimed, much less shown, that they were actually denied a hearing on any factual matter pertaining to coverage under the challenged provisions.[27] Nor have they identified any factual issue requiring a hearing. Instead, Plaintiffs' dispute is with the legality of those provisions, under which they are clearly not covered. *See*, Amended Complaint [#34] at ¶ 10 ("None of the Plaintiffs meet any of the listed exceptions."). A hearing would have served no purpose, since Plaintiffs admit that they are not presently covered by the challenged New York statute, and they have not identified any factual issue relating to coverage. Consequently, 42 C.F.R. § 431.220(b) obviated the requirement for a hearing.

Plaintiffs maintain, though, that pursuant to 42 C.F.R. § § 431.206 & 431.210, they were still entitled to notice that their coverage was being

---

[27] In a memo of law, Plaintiffs' counsel argues that Plaintiffs "must . . . be given the opportunity to challenge Defendant's actions and argue that they, in fact, meet one or more of the available exceptions under which coverage is available." Pl. Memo of Law [#31] at p. 17. However, that is not one of Plaintiffs' claims in this action, and in any event the record is devoid of any suggestion that any Plaintiff actually qualifies for coverage under the exceptions, or that he was denied the opportunity for a hearing on such issue. Rather, the Amended Complaint admits that Plaintiffs are not covered. Amended Complaint [#34] at ¶ 10 ("*None of the Plaintiffs meet any of the listed exceptions.*") (emphasis added). Consequently, Plaintiffs' argument on that point lacks merit.

terminated.  The first of those regulations states, in pertinent part:

a) The agency must issue and publicize its hearing procedures.

(b) The agency must, at the time specified in paragraph (c) of this section, inform every applicant or beneficiary in writing– (1) Of his right to a hearing; (2) Of the method by which he may obtain a hearing; and (3) That he may represent himself or use legal counsel, a relative, a friend, or other spokesman.

(c) The agency must provide the information required in paragraph (b) of this section– (1) At the time that the individual applies for Medicaid; (2) At the time of any action affecting his or her claim; (3) At the time a skilled nursing facility or a nursing facility notifies a resident in accordance with § 483.12 of this chapter that he or she is to be transferred or discharged; and (4) At the time an individual receives an adverse determination by the State with regard to the preadmission screening and annual resident review requirements of section 1919(e)(7) of the Act.

42 C.F.R. § 431.206 (emphasis added).  The second regulation states:

A notice required under § 431.206(c)(2), (c)(3), or (c)(4) of this subpart must contain--

(a) A statement of what action the State, skilled nursing facility, or nursing facility intends to take;

(b) The reasons for the intended action;

(c) The specific regulations that support, or the change in Federal or State law that requires, the action;

(d) An explanation of– (1) The individual's right to request an evidentiary hearing if one is available, or a State agency hearing; or (2) In cases of an action based on a change in law, the circumstances

33

under which a hearing will be granted; and

(e) An explanation of the circumstances under which Medicaid is continued if a hearing is requested.

42 C.F.R. § 431.210. The Court agrees with Plaintiffs that these provisions envision the State giving notice to beneficiaries when coverage is altered or eliminated due to a change in the law. That is true even where, as here, the beneficiary may not be entitled to a hearing, due to the lack of any factual issue.

Defendant denies that Plaintiffs were entitled to a notice, but his argument, as to both the notice and hearing aspects of Plaintiffs' due process claim, is cursory, consisting of a single paragraph,[28] in which he cites three cases for support: *Rosen v. Goetz*, cited above, *Knapp v. Armstrong*, No. 1:11–cv–00307– BLW, 2012 WL 640890 at *5 (D.Idaho Feb. 26, 2012) and *M.R. v. Dreyfus*, 767 F.Supp.2d 1149, 1166-1167 (W.D.Wa. 2011). However, *Rosen v. Goetz* does not support Defendant on this point, since in that case the defendant actually gave notice to beneficiaries that it was eliminating Medicaid coverage, and the issue related to the adequacy of such notice. The court in *Rosen v. Goetz* did not indicate that the defendant could have dispensed with notice altogether. The Court is similarly unpersuaded by *Knapp v. Armstrong*, whose actual holding on this point is only that "Medicaid participants are not guaranteed *a hearing* before implementation of an across-the-board measure aimed at cost-cutting." *Id.*, 2012

---

[28] *See*, Def. Memo of Law [#28-1] at pp. 12-13.

WL 640890 at *5 (emphasis added). Moreover, while the *Knapp* decision refers to "notice" in passing, it does not actually analyze the issue of notice. The other decision cited by Defendant, *M.R. v. Dreyfus*, was reversed by the Ninth Circuit, at 663 F.3d 1100 (9th Cir. 2011), and is also factually inapposite, since in that case the State of Washington sent the affected Medicare recipients a "service reduction notice." *See, id.*, 767 F.Supp.2d at 1166; *see also, id.* at 1155 ("This litigation ensued shortly after DSHS sent out the service reduction notices."). The plaintiffs in that action argued that the notice they received should have provided additional information. *Id.*, 767 F.Supp.2d at 1166. The *M.R. v. Dreyfus* decision does include language that "Plaintiffs are not entitled to *notice or hearing* rights for an across-the-board budget reduction," but that appears to be an over-broad statement, since the decision actually only discussed the right to a hearing, not the separate right to notice. *See, Id.* at 1166-1167 (emphasis added).

In summary, the authority cited by Defendant does not support the idea that a state can discontinue Medicaid coverage without giving the affected beneficiaries any notice whatsoever, such as happened in the instant case. *Compare, Pashby v. Delia*, 709 F.3d 307, 315 (4th Cir. 2013) (In a case involving a similar state-wide reduction in Medicaid services, the State of North Carolina sent written notices to the affected beneficiaries: "Before IHCA Policy 3E went into effect, the DHHS mailed letters informing approximately 2,405 individuals — including the named Appellees and certified class members — that they no longer met the eligibility requirements for in-home PCS and would cease to receive the service as of June 1,

2011.").  Accordingly, Plaintiffs are entitled to summary judgment on the notice
aspect of their due process claim.

### Plaintiffs' Discrimination Claims Under the ADA and Section 504[29]

Lastly, Plaintiffs maintain that the challenged provisions violate the
"integration mandate" and "methods of administration" provisions of the ADA and
Section 504.[30]  In that regard, the ADA's[31] "integration mandate," 28 C.F.R. §
35.130(d), states that "[a] public entity shall administer services, programs, and
activities in the most integrated setting appropriate to the needs of qualified
individuals with disabilities."  Plaintiffs maintain that the challenged provisions
violate that mandate, because unless the State provides orthopedic shoes and
compression stockings to them, they face a risk of "unnecessary
institutionalization."  See, Pl. Memo of Law [#26-2] at pp. 23-24.[32]  More

---

[29] "Title II of the ADA provides, in relevant part, that no qualified individual with a disability
shall, by reason of such disability, be excluded from participation in or be denied the benefits of the
services, programs, or activities of a public entity, or be subjected to discrimination by any such
entity. 42 U.S.C. § 12132. To prove a violation of Title II, a party must therefore establish: (1) that
he is a qualified individual with a disability; (2) that he was excluded from participation in a public
entity's services, programs or activities or was otherwise discriminated against by a public entity;
and (3) that such exclusion or discrimination was due to his disability.  These requirements apply
with equal force to plaintiffs' Rehabilitation Act claims." M.K. ex rel. Mrs. K. v. Sergi, 554
F.Supp.2d 175, 194-195 (D.Conn. 2008) (citations omitted).

[30] See, Pl. Memo of Law [#26-2] at pp. 23-25; Pl. Memo of Law [#31] at pp. 18-19.

[31] "Section 504 of the Rehabilitation Act and the ADA impose identical requirements."
Rodriguez v. City of New York, 197 F.3d 611, 618 (2d Cir. 1999).

[32] See, id. at p. 24 ("Plaintiff Wallach has already resided in a nursing home, and could very
well be forced to return there without the services necessary to maintain her health in the
community.  Defendant's failure to cover their treatments has already rendered  Plaintiffs Davis and
Poole virtually home bound, isolating them from the community in violation of Olmstead, the ADA
and Section 504.").

specifically, Plaintiffs maintain that if they cannot obtain orthopedic shoes and compression stockings, they will develop more serious medical problems, and they will likely end up in hospitals or nursing homes, which would violate the integration mandate.

Additionally, the ADA's "methods of administration" provision, 28 C.F.R. § 35.130(b)(3), states:

> (3) A public entity may not, directly or through contractual or other arrangements, utilize criteria or methods of administration: (i) That have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; (ii) That have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities; or (iii) That perpetuate the discrimination of another public entity if both public entities are subject to common administrative control or are agencies of the same State.

28 C.F.R. § 35.130(b)(3).[33]  Plaintiffs contend that the challenged provisions also violate that regulation

> by utilizing methods of administration that subject [them] to discrimination on the basis of disability, including risk of unnecessary institutionalization, and by failing to account for individual medical necessity in the denial of coverage for orthopedic footwear and compression stockings that would enable [them] to remain in the community.

Amended Complaint [#34] at 29.  With regard to both the "integration mandate"

---

[33] This regulation pertains to the ADA.  Plaintiffs maintain that the challenged provisions violate similar provisions relating to Section 504 – 28 C.F.R. § 41.51(b)(3)(i) & 45 C.F.R. § 84.4(b)(4). *See*, Pl. Memo of Law [#26-2] at p. 25, n. 12.

and "methods of administration" aspects of their claim, the Court understands

Plaintiffs to be arguing, in part, that the challenged provisions are discriminatory

because they unfairly treat some Medicaid recipients better than others, solely on

the basis of diagnosis.

Defendant opposes these claims, and contends that a state's decision as to

how to best allocate funds among disabled persons cannot be considered

discrimination.  In that regard, Defendant states, in pertinent part:

> Absent invidious classifications, a State's decision about 'allocating
> limited public welfare funds' is not 'discrimination.' *Dandridge v.
> Williams*, 397 U.S. 471, 487 (1970).[34]  When there are many
> competing demands for public assistance and only limited public
> funds, States 'must necessarily engage in a process of line-drawing' in
> extending benefits. *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166,
> 179 (1980);[35] *accord, Shweiker v. Wilson*, 450 U.S. 221, 243 (1981)
> ("[T]he apportionment of scarce benefits for public welfare requires
> painful but unavoidable line-drawing.").[36]  Where that line is drawn will
> necessarily disappoint some individuals who may desire and who could
> benefit from prosthetics (such as orthopedic footwear and
> compression/support stockings), but that decision is a policy choice
> 'for legislative, rather than judicial, consideration.' *Fritz*, 449 U.S. at
> 179.  The ADA requires only that a particular service provided to some
> [non-disabled people] not be denied to disabled people. *Doe v.
> Pfrommer*, 148 F.3d 73, 83 (2d Cir. 1998).

---

[34] *Dandridge* involved a challenge to Maryland's welfare laws under the Equal Protection
Clause, not the ADA or Section 504.

[35] *Fritz* involved a Fifth Amendment Due Process Clause challenge to the Railroad Retirement
Act of 1974.  The decision did not involve the ADA or Section 504. *Fritz*, 101 S.Ct. at 459.

[36] Although Defendant's brief does not indicate it, this citation is to the dissenting opinion in
*Schweiker*.  Moreover, *Schweiker* did not involve the ADA or Section 504, and the legislation being
challenged in that case did not differentiate among persons solely on the basis of disability.

Def. Memo of Law [#28-1] at p. 13 (some internal quotation marks omitted). From this statement and from the cases that Defendant has cited, the Court understands Defendant's argument to be that the State's exercise in line-drawing between Medicaid recipients is permissible as long as it is rationally-related to a legitimate governmental objective.

However, the Court disagrees and finds that Plaintiffs are entitled to judgment on this claim. In that regard, at the outset, the Supreme Court has indicated that "[u]njustified isolation . . . is properly regarded as discrimination based on disability," under the ADA and Section 504. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597, 119 S.Ct. 2176, 2185 (1999).[37] Plaintiffs maintain, and Defendant does not dispute, that the elimination of coverage for orthopedic shoes and compression stockings for Plaintiffs may result in them being institutionalized.[38]

When a state's policies lead to discrimination against the disabled, which includes "unjustified isolation," the state must make "reasonable modifications," unless such modifications would "fundamentally alter" the service, program or

---

[37] "[In *Olmstead*] the Court held that the word 'discrimination' as used in [42 U.S.C.] § 12132 includes not only disparate treatment of comparably situated persons but also undue institutionalization of disabled persons, *no matter how anyone else is treated.*" *Amundson v. Wisconsin Dept. of Health Servs.*, 721 F.3d 871, 874 (7th Cir. 2013) (emphasis in original).

[38] "Because Congress instructed the DOJ to issue regulations regarding Title II, we are especially swayed by the DOJ's determination that the ADA and the *Olmstead* decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings." *Pashby v. Delia*, 709 F.3d at 322 (emphasis added, citation omitted).

activity being offered. *Olmstead*, 119 S.Ct. at 2188. On that point, the pertinent regulation states:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7). Plaintiffs essentially maintain that the State should accommodate them by continuing to provide them orthopedic shoes and compression stockings.[39] In opposing that request, Defendant references the financial reasons that prompted the challenged changes in coverage, but does not specifically argue that modifying the Medicaid program, to include coverage of orthopedic shoes and compression stockings for Plaintiffs, would fundamentally alter the program. *See*, Def. Memo of Law [#28-1] (Containing no such argument).[40]

---

[39] It appears that modification of a program's eligibility requirements can constitute a reasonable accommodation under the ADA and Section 504. *See, Pashby v. Delia*, 709 F.3d at 323-324 (Plaintiffs were disabled individuals who were able to reside outside of institutions because of services provided by the State of North Carolina; when the state restricted those services to persons with more severe disabilities, the plaintiffs faced the threat of institutionalization, and requested that the State accommodate them by modifying the Medicaid program's requirements. The Fourth Circuit Court of Appeals gave no indication that such a modification would have been an unreasonable accommodation. To the contrary, the Court held that the State of North Carolina had "failed to make out a successful fundamental alteration defense," and that the plaintiffs were "likely to succeed on the merits of their ADA and Rehabilitation Act claims." ).

[40] In any event, *see also, Pashby v. Delia*, 709 F.3d 307, 323-324 (4th Cir. 2013) ("We join the Third, Ninth, and Tenth Circuits in holding that, although budgetary concerns are relevant to the fundamental alteration calculus, financial constraints alone cannot sustain a fundamental alteration defense." ).

Instead, Defendant maintains that this is a "level-of-benefits" claim that is not covered by *Olmstead* or the integration mandate. *See*, Def. Memo of Law [#28-1] at p. 14. In support of this argument, Defendant refers to the following language from the *Olmstead* decision:

> We do not in this opinion hold that the ADA imposes on the States a "standard of care" for whatever medical services they render, or that the ADA requires States to "provide a certain level of benefits to individuals with disabilities." We do hold, however, that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide.

*Olmstead*, 119 S.Ct. at 2188, n. 14 (citation omitted). Relying upon this statement, Defendant maintains that Plaintiffs are not really complaining about discrimination, but rather, they are impermissibly attempting to force the State to provide them with a "certain level of benefits." *See*, Def. Memo of Law [#28-1] at p. 14 (Stating that *Olmstead* addresses "only discrimination, not [the] level-of-benefits claims that exist here."). However, the Court disagrees.

In the Court's view, the above-quoted language from *Olmstead* refers to situations in which Medicaid-recipients are attempting to force the state to provide them with benefits that it does not provide to anyone. As to this issue, in *Rodriguez v. City of New York*, cited earlier, a case in which the plaintiffs' were seeking a Medicaid benefit called "safety monitoring," the Second Circuit stated, in pertinent part:

> The ADA requires only that a particular service provided to some not be denied to disabled people. . . . [T]he services that New York

41

provides to the mentally disabled are no different from those provided to the physically disabled. Neither group is provided with independently tasked safety monitoring. Hence, what appellees are challenging is not illegal discrimination against the disabled, but the substance of the services provided. Thus, New York cannot have unlawfully discriminated against appellees by denying a benefit that it provides to no one.

* * *

Appellees place much reliance on the Supreme Court's recent decision in [*Olmstead*]. . . . The portion of the [*Olmstead*] opinion most relevant to the instant dispute was the Court's statement that it was explicitly not holding that the ADA imposes on the States a standard of care for whatever medical services they render, or that the ADA requires states to provide a certain level of benefits to individuals with disabilities. *Olmstead* does not, therefore, stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions. Instead, it holds only that States must adhere to the ADA's nondiscrimination requirement with regard to the services they in fact provide. Appellees want New York to provide a new benefit, while *Olmstead* reaffirms that the ADA does not mandate the provision of new benefits.

*Rodriguez*, 197 F.3d at 618-619 (citations and internal quotation marks omitted).[41]

Here, Defendant's reliance on *Olmstead* is misplaced, since it misses the point that Defendant is already providing orthopedic shoes and compression stockings to certain Medicaid recipients. Therefore, this is not a situation where Plaintiffs are demanding that the State provide them with a benefit that it is not

---

[41] *Rodriguez* involved an optional benefit under New York's Medicaid Plan. *See, Rodriguez*, 197 F.3d at 613 ("New York has opted to include personal-care services, which are not federally required."). Although the Court in that case found no ADA/Section 504 violation, it appears that the optional nature of the benefit had no bearing on that determination. That is, it appears that if the Court had found that New York was discriminating, it would have found an ADA/Section 504 violation even though the service was optional.

providing to anyone else. Rather, this is a situation where Plaintiffs are demanding

that the State not discriminate against them in that regard, solely on the basis of

diagnosis. *Olmstead* directs that "States must adhere to the ADA's

nondiscrimination requirement with regard to the services they in fact provide."

*Olmstead*, 119 S.Ct. at 2188, n. 14 (citation omitted). Moreover, it is well-

accepted that a State may commit discrimination by treating one type of disabled

person worse than another type of disabled person. *See, e.g., Amundson v.

Wisconsin Dept. of Health Servs.*, 721 F.3d at 874 ("[P]laintiffs' contention that

they are being treated worse than persons with other disabilities is ripe. If

Wisconsin buys the best available care for persons with visual impairments, but

pays only for mediocre care for the developmentally disabled, then plaintiffs have a

theory of discrimination[.] . . . [A]fter *Olmstead* several appellate courts have

concluded that discrimination among persons with different disabilities can state a

good claim.") (Easterbrook, C.J.) (citations omitted); *see also, Rodriguez v. City of

New York*, 197 F.3d at 618 (`Indicating that providing services to the mentally

disabled that were different from those provided to the physically disabled would

amount to "illegal discrimination against the disabled."). Defendant has not really

addressed this aspect of Plaintiffs' claim. Consequently, the Court finds that

Plaintiffs are entitled to summary judgment on their ADA/Section 504 claims.

## CONCLUSION

The parties' cross-motions for summary judgment [#26][#28] are each

granted-in-part and denied-in-part as follows: Plaintiffs' motion [#26] is denied as

43

to the "home health services" claim and the due process hearing claim, but is otherwise granted, while Defendant's motion [#28] is granted only as to the "home health services" claim and the due process hearing claim, but is otherwise denied. Plaintiffs are entitled to permanent injunctive relief. The parties shall settle and submit a proposed Order concerning such injunctive relief within fourteen (14) days of the date of this Decision and Order.

So Ordered.

Dated:     Rochester, New York
           December 9, 2013

                              ENTER:


                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge